# GROVE CITY COLLEGE ET AL. *v.* BELL, SECRETARY OF EDUCATION, ET AL.

No. 82–792.   Argued November 29, 1983—Decided February 28, 1984

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and BLACKMUN, POWELL, REHNQUIST, and O'CONNOR, JJ., joined, and in all but Part III of which BRENNAN, MARSHALL, and STEVENS, JJ., joined. POWELL, J., filed a concurring opinion, in which BURGER, C. J., and O'CONNOR, J., joined, *post*, p. 576. STEVENS, J., filed an opinion concurring in part and concurring in the result, *post*, p. 579. BRENNAN, J., filed an opinion concurring in part and dissenting in part, in which MARSHALL, J., joined, *post*, p. 581.

*David M. Lascell* argued the cause for petitioners. With him on the briefs was *Robb M. Jones.*

*Acting Solicitor General Bator* argued the cause for respondents. With him on the briefs were *Solicitor General*

Lee, Assistant Attorney General Reynolds, Deputy Assistant Attorney General Cooper, John H. Garvey, and Brian K. Landsberg.*

JUSTICE WHITE delivered the opinion of the Court.

Section 901(a) of Title IX of the Education Amendments of 1972, Pub. L. 92–318, 86 Stat. 373, 20 U. S. C. § 1681(a), prohibits sex discrimination in "any education program or activity receiving Federal financial assistance,"[1] and § 902 directs agencies awarding most types of assistance to promulgate regulations to ensure that recipients adhere to that prohibition. Compliance with departmental regulations may be secured by termination of assistance "to the particular program, or part thereof, in which . . . noncompliance has

---

*Briefs of *amici curiae* urging reversal were filed for the Equal Employment Advisory Council by *Robert E. Williams, Douglas S. McDowell,* and *Edward E. Potter;* for Hillsdale College by *Robert W. Barker;* and for the Pacific Legal Foundation by *Ronald A. Zumbrun* and *John H. Findley.*

Briefs of *amici curiae* urging affirmance were filed for the American Association of University Women et al. by *Nancy Duff Campbell* and *Margaret A. Kohn;* for the Council of Collegiate Women Athletic Administrators by *Lionel S. Sobel;* for the Lawyers' Committee for Civil Rights Under Law by *Richard C. Dinkelspiel, Norman Redlich, William L. Robinson, Norman J. Chachkin,* and *Roger L. Waldman;* and for the Mexican American Legal Defense and Educational Fund et al. by *Robert H. Kapp, Joseph M. Hassett, John C. Keeney, Jr., Joaquin Avila,* and *Morris J. Baller.*

Briefs of *amici curiae* were filed for the Mountain States Legal Foundation et al. by *Maxwell A. Miller;* for Wabash College by *David N. Shane;* and for Representative Claudine C. Schneider et al. by *Karen Syma Shinberg Czapanskiy.*

[1] Section 901(a), 20 U. S. C. § 1681(a), provides, in pertinent part:

"No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ."

Nine statutory exemptions, none of which is relevant to the disposition of this case, follow. See §§ 901(a)(1)–(9), 20 U. S. C. §§ 1681(a)(1)–(9).

been . . . found" or by "any other means authorized by law." § 902, 20 U. S. C. § 1682.[2]

This case presents several questions concerning the scope and operation of these provisions and the regulations established by the Department of Education. We must decide, first, whether Title IX applies at all to Grove City College, which accepts no direct assistance but enrolls students who receive federal grants that must be used for educational purposes. If so, we must identify the "education program or activity" at Grove City that is "receiving Federal financial assistance" and determine whether federal assistance to that

---

[2] Section 902, 20 U. S. C. § 1682, provides:

"Each Federal department and agency which is empowered to extend Federal financial assistance to any education program or activity, by way of grant, loan, or contract other than a contract of insurance or guaranty, is authorized and directed to effectuate the provisions of section [901] with respect to such program or activity by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken. No such rule, regulation, or order shall become effective unless and until approved by the President. Compliance with any requirement adopted pursuant to this section may be effected (1) by the termination of or refusal to grant or to continue assistance under such program or activity to any recipient as to whom there has been an express finding on the record, after opportunity for hearing, of a failure to comply with such requirement, but such termination or refusal shall be limited to the particular political entity, or part thereof, or other recipient as to whom such a finding has been made, and shall be limited in its effect to the particular program, or part thereof, in which such noncompliance has been so found, or (2) by any other means authorized by law: *Provided, however*, That no such action shall be taken until the department or agency concerned has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means. In the case of any action terminating, or refusing to grant or continue, assistance because of failure to comply with a requirement imposed pursuant to this section, the head of the Federal department or agency shall file with the committees of the House and Senate having legislative jurisdiction over the program or activity involved a full written report of the circumstances and the grounds for such action. No such action shall become effective until thirty days have elapsed after the filing of such report" (emphasis in original).

program may be terminated solely because the College violates the Department's regulations by refusing to execute an Assurance of Compliance with Title IX. Finally, we must consider whether the application of Title IX to Grove City infringes the First Amendment rights of the College or its students.

## I

Petitioner Grove City College is a private, coeducational, liberal arts college that has sought to preserve its institutional autonomy by consistently refusing state and federal financial assistance. Grove City's desire to avoid federal oversight has led it to decline to participate, not only in direct institutional aid programs, but also in federal student assistance programs under which the College would be required to assess students' eligibility and to determine the amounts of loans, work-study funds, or grants they should receive.[3] Grove City has, however, enrolled a large number of students who receive Basic Educational Opportunity Grants (BEOG's), 20 U. S. C. § 1070a (1982 ed.), under the Department of Education's [4] Alternate Disbursement System (ADS).[5]

---

[3] See, e. g., 20 U. S. C. § 1071 et seq. (1982 ed.); 34 CFR pt. 674 (1983) (National Direct Student Loans); 42 U. S. C. § 2751 et seq. (1976 ed. and Supp. V); 34 CFR pt. 675 (1983) (College Work Study Program); 20 U. S. C. § 1070b (1982 ed.); 34 CFR pt. 676 (1983) (Supplemental Educational Opportunity Grants).

[4] The Department of Health, Education, and Welfare's functions with respect to BEOG's were transferred to the Department of Education by § 301(a)(3) of the Department of Education Organization Act, Pub. L. 96–88, 93 Stat. 678, 20 U. S. C. § 3441(a)(3) (1982 ed.). We will refer to both HEW and DOE as "the Department."

[5] The Secretary, in his discretion, has established two procedures for computing and disbursing BEOG's. Under the Regular Disbursement System (RDS), the Secretary estimates the amount that an institution will need for grants and advances that sum to the institution, which itself selects eligible students, calculates awards, and distributes the grants by either crediting students' accounts or issuing checks. 34 CFR §§ 690.71–690.85 (1983). Most institutions whose students receive BEOG's participate in the RDS, but the ADS is an option made available by the Secretary

The Department concluded that Grove City was a "recipient" of "Federal financial assistance" as those terms are defined in the regulations implementing Title IX, 34 CFR §§ 106.2(g)(1), (h) (1982),[6] and, in July 1977, it requested that the College execute the Assurance of Compliance required by 34 CFR § 106.4 (1983). If Grove City had signed the Assurance, it would have agreed to

> "[c]omply, to the extent applicable to it, with Title IX . . . and all applicable requirements imposed by or pursuant to the Department's regulation . . . to the end that . . . no person in the United States shall, on the basis of sex, be . . . subjected to discrimination under any education program or activity for which [it] receives or bene-

---

to schools that wish to minimize their involvement in the administration of the BEOG program. Institutions participating in the program through the ADS must make appropriate certifications to the Secretary, but the Secretary calculates awards and makes disbursements directly to eligible students. 34 CFR §§ 690.91–690.96 (1983).

[6] The Title IX regulations were recodified in 1980, without substantive change, at 34 CFR pt. 106 in connection with the establishment of the Department of Education. 45 Fed. Reg. 30802, 30962–30963 (1980). All references herein are to the currently effective regulations.

"Federal financial assistance" is defined in 34 CFR § 106.2(g)(1) (1983) to include:

"A grant or loan of Federal financial assistance, including funds made available for:

.            .            .            .            .

"(ii) Scholarships, loans, grants, wages or other funds extended to any entity for payment to or on behalf of students admitted to that entity, or extended directly to such students for payment to that entity."

A "recipient" is defined in 34 CFR § 106.2(h) (1983) to include:

"[A]ny public or private agency, institution, or organization, or other entity, or any person, to whom Federal financial assistance is extended directly or through another recipient and which operates an education program or activity which receives or benefits from such assistance . . . ."

See also 34 CFR §§ 106.11, 106.31(a) (1983).

fits from Federal financial assistance from the Department." App. to Pet. for Cert. A–126—A–127.[7]

When Grove City persisted in refusing to execute an Assurance, the Department initiated proceedings to declare the College and its students ineligible to receive BEOG's.[8] The Administrative Law Judge held that the federal financial assistance received by Grove City obligated it to execute an Assurance of Compliance and entered an order terminating assistance until Grove City "corrects its noncompliance with Title IX and satisfies the Department that it is in compliance" with the applicable regulations. App. to Pet. for Cert. A–97.

Grove City and four of its students then commenced this action in the District Court for the Western District of Pennsylvania, which concluded that the students' BEOG's constituted "Federal financial assistance" to Grove City but held, on several grounds, that the Department could not terminate the students' aid because of the College's refusal to execute an Assurance of Compliance. *Grove City College* v. *Harris*, 500 F. Supp. 253 (1980).[9] The Court of Appeals reversed.

_____

[7] The Assurance of Compliance form currently in use differs somewhat from the version quoted in the text. See App. to Brief for Federal Respondents in *Hillsdale College* v. *Department of Education*, O. T. 1982, No. 82–1538, pp. 1a–2a. The substance, however, is the same in that it refers to "education programs and activities receiving Federal financial assistance."

[8] The Department also sought to terminate Guaranteed Student Loans (GSL's), 20 U. S. C. § 1071 (1982 ed.), received by Grove City's students.

[9] The District Court held, first, that GSL's were "contract[s] of insurance or guaranty" that could not be terminated under § 902 of Title IX. The Department did not challenge this conclusion on appeal, and we express no view on this aspect of the District Court's reasoning. The court also concluded that Grove City could not be required to execute an Assurance of Compliance because Subpart E of the Title IX regulations, which prohibits discrimination in employment, was invalid. As the Court of Appeals recognized, we have since upheld the validity of Subpart E. *North Haven Board of Education* v. *Bell*, 456 U. S. 512 (1982). The Dis-

687 F. 2d 684 (CA3 1982). It first examined the language and legislative history of Title IX and held that indirect, as well as direct, aid triggered coverage under § 901(a) and that institutions whose students financed their educations with BEOG's were recipients of federal financial assistance within the meaning of Title IX. Although it recognized that Title IX's provisions are program-specific, the court likened the assistance flowing to Grove City through its students to nonearmarked aid, and, with one judge dissenting, declared that "[w]here the federal government furnishes indirect or non-earmarked aid to an institution, it is apparent to us that the institution itself must be the 'program.'" 687 F. 2d, at 700.[10] Finally, the Court of Appeals concluded that the Department could condition financial aid upon the execution of an Assurance of Compliance and that the Department had acted properly in terminating federal financial assistance to the students and Grove City despite the lack of evidence of actual discrimination.

---

trict Court held, in the alternative, that § 902 permitted termination only upon an actual finding of sex discrimination and that Grove City's refusal to execute an Assurance could not justify a termination of assistance. Finally, the court reasoned that affected students were entitled to hearings before their aid could be discontinued.

[10] In reaching this conclusion, the Court of Appeals accepted the position argued by respondents. As respondents acknowledged in the oral argument before this Court, the Department's position has not been a model of clarity. Tr. of Oral Arg. 33–35. The Department initially took the position that the receipt of student financial aid would trigger institutionwide coverage under Title IX and construed its regulations to that effect. It pressed that position in the lower courts. In their brief in opposition to the petition for certiorari, respondents did not defend this aspect of the Court of Appeals' opinion, but argued instead that the question need not be resolved to decide this case. In their brief on the merits and in the oral argument, however, respondents conceded that the Court of Appeals erred in holding that Grove City itself constituted the "program or activity" subject to regulation under Title IX. The Department's regulations, it was represented, may be construed in a program-specific manner and hence are not inconsistent with the statute. This concession, of course, is not binding on us and does not foreclose our review of the judgment below.

We granted certiorari, 459 U. S. 1199 (1983), and we now affirm the Court of Appeals' judgment that the Department could terminate BEOG's received by Grove City's students to force the College to execute an Assurance of Compliance.

## II

In defending its refusal to execute the Assurance of Compliance required by the Department's regulations, Grove City first contends that neither it nor any "education program or activity" of the College receives any federal financial assistance within the meaning of Title IX by virtue of the fact that some of its students receive BEOG's and use them to pay for their education. We disagree.

Grove City provides a well-rounded liberal arts education and a variety of educational programs and student services. The question is whether any of those programs or activities "receiv[es] Federal financial assistance" within the meaning of Title IX when students finance their education with BEOG's. The structure of the Education Amendments of 1972, in which Congress both created the BEOG program and imposed Title IX's nondiscrimination requirement, strongly suggests an affirmative conclusion. BEOG's were aptly characterized as a "centerpiece of the bill," 118 Cong. Rec. 20297 (1972) (Rep. Pucinski), and Title IX "relate[d] directly to [its] central purpose." 117 Cong. Rec. 30412 (1971) (Sen. Bayh). In view of this connection and Congress' express recognition of discrimination in the administration of student financial aid programs,[11] it would indeed be anomalous to discover that one of the primary components of Congress' comprehensive "package of federal aid," *id.*, at 2007 (Sen. Pell), was not intended to trigger coverage under Title IX.

---

[11] See, *e. g.*, Discrimination Against Women: Hearings on Section 805 of H. R. 16098 before the Special Subcommittee on Education of the House Committee on Education and Labor, 91st Cong., 2d Sess., 235 (1970) (Rep. May); *id.*, at 433 (Rep. Mink); *id.*, at 739 (Rep. Griffiths); 118 Cong. Rec. 3935–3940, 5803–5809 (1972) (Sen. Bayh).

It is not surprising to find, therefore, that the language of § 901(a) contains no hint that Congress perceived a substantive difference between direct institutional assistance and aid received by a school through its students. The linchpin of Grove City's argument that none of its programs receives any federal assistance is a perceived distinction between direct and indirect aid, a distinction that finds no support in the text of § 901(a).[12] Nothing in § 901(a) suggests that Congress elevated form over substance by making the application of the nondiscrimination principle dependent on the manner in which a program or activity receives federal assistance. There is no basis in the statute for the view that only institutions that themselves apply for federal aid or receive checks directly from the Federal Government are subject to regulation. Cf. *Bob Jones University* v. *Johnson*, 396 F. Supp. 597, 601–604 (SC 1974), affirmance order, 529 F. 2d 514 (CA4 1975). As the Court of Appeals observed, "by its all inclusive terminology [§ 901(a)] appears to encompass *all* forms of federal aid to education, direct or indirect." 687 F. 2d, at 691 (emphasis in original). We have recognized the need to "'accord [Title IX] a sweep as broad as its language,'" *North Haven Board of Education* v. *Bell*, 456 U. S. 512, 521 (1982) (quoting *United States* v. *Price*, 383 U. S. 787, 801 (1966)), and we are reluctant to read into § 901(a) a limitation not apparent on its face.

---

[12] Grove City itself recognizes the problematic nature of the distinction it advances. Although its interpretation of § 901(a) logically would exclude from coverage under Title IX local school districts that receive federal funds through state educational agencies, see, *e. g.*, 20 U. S. C. § 3801 *et seq.* (1982 ed.), Grove City wisely does not attempt to defend this result. In fact, the College concedes that "[b]ecause federal assistance is often passed through state agencies, this type of indirect assistance leads to Title IX jurisdiction *over the education program or activity* which ultimately receives the assistance." Brief for Petitioners 17, n. 17 (emphasis in original). Grove City has proposed no principled basis for treating differently federal assistance received through students and federal aid that is disbursed by a state agency.

Our reluctance grows when we pause to consider the available evidence of Congress' intent. The economic effect of direct and indirect assistance often is indistinguishable, see *Mueller* v. *Allen*, 463 U. S. 388, 397, n. 6 (1983); *id.*, at 412 (MARSHALL, J., dissenting); *Committee for Public Education* v. *Nyquist*, 413 U. S. 756, 783 (1973); *Norwood* v. *Harrison*, 413 U. S. 455, 463–465 (1973), and the BEOG program was structured to ensure that it effectively supplements the College's own financial aid program.[13] Congress undoubtedly comprehended this reality in enacting the Education Amendments of 1972. The legislative history of the Amendments is replete with statements evincing Congress' awareness that the student assistance programs established by the

---

[13] Grove City's students receive BEOG's to pay for the education they receive at the College. Their eligibility for assistance is conditioned upon continued enrollment at Grove City and on satisfactory progress in their studies. 20 U. S. C. §§ 1091(a)(1), (3) (1982 ed.). Their grants are based on the "cost of attendance" at Grove City, 20 U. S. C. § 1070a(a)(2)(B)(i) (1982 ed.), which includes the College's tuition and fees, room and board, and a limited amount for books, supplies, and miscellaneous expenses. 34 CFR § 690.51 (1983). The amount that students and their families can reasonably be expected to contribute is subtracted from the maximum BEOG to ensure that the assistance is used solely for educational expenses, 20 U. S. C. § 1070a(a)(2)(A)(i) (1982 ed.), and students are required to file affidavits stating that their awards will be "used solely for expenses related to attendance" at Grove City. 20 U. S. C. § 1091(a)(5) (1982 ed.); see 34 CFR §§ 690.79, 690.94(a)(2) (1983).

Grove City's attempt to analogize BEOG's to food stamps, Social Security benefits, welfare payments, and other forms of general-purpose governmental assistance to low-income families is unavailing. First, there is no evidence that Congress intended the receipt of federal money in this manner to trigger coverage under Title IX. Second, these general assistance programs, unlike student aid programs, were not designed to assist colleges and universities. Third, educational institutions have no control over, and indeed perhaps no knowledge of, whether they ultimately receive federal funds made available to individuals under general assistance programs, but they remain free to opt out of federal student assistance programs. Fourth, individuals' eligibility for general assistance is not tied to attendance at an educational institution.

Amendments would significantly aid colleges and universities.[14]  In fact, one of the stated purposes of the student aid provisions was to "provid[e] assistance to institutions of higher education."  Pub. L. 92–318, § 1001(c)(1), 86 Stat. 381, 20 U. S. C. § 1070(a)(5).

Congress' awareness of the purpose and effect of its student aid programs also is reflected in the sparse legislative history of Title IX itself.  Title IX was patterned after Title VI of the Civil Rights Act of 1964, Pub. L. 88–352, 78 Stat. 252, 42 U. S. C. § 2000d *et seq.* (1976 ed. and Supp. V). *Cannon* v. *University of Chicago*, 441 U. S. 677, 684–685 (1979); 118 Cong. Rec. 5807 (1972) (Sen. Bayh).  The drafters of Title VI envisioned that the receipt of student aid funds would trigger coverage,[15] and, since they approved identical language, we discern no reason to believe that the Congressmen who voted for Title IX intended a different result.

The few contemporaneous statements that attempted to give content to the phrase "receiving Federal financial assistance," while admittedly somewhat ambiguous, are consistent with Senator Bayh's declaration that Title IX authorizes the

---

[14] See, *e. g.*, H. R. Rep. No. 92–554, p. 244 (1972) (Supplemental Views); 117 Cong. Rec. 2007 (1971) (Sen. Pell); *id.*, at 37778, 37782 (Rep. Quie); *id.*, at 39256 (Rep. Steiger); 118 Cong. Rec. 20295 (1972) (Rep. Reid); *id.*, at 20297 (Rep. Pucinski); *id.*, at 20312 (statement of Isaac K. Beckes); *id.*, at 20310 (letter from Kingman Brewster, Jr.); *id.*, at 20324 (Rep. Mitchell).

[15] See, *e. g.*, H. R. Rep. No. 914, 88th Cong., 1st Sess., 104–105 (1963); 110 Cong. Rec. 13388 (1964) (Sen. McClellan).  Appendix A to the initial Title VI regulations identified several programs making assistance available through payments to students among those to which the regulations applied, 29 Fed. Reg. 16298, 16304 (1964), as did the version in force when Title IX was enacted.  45 CFR pt. 80, Appendix A (1972).  See *Bob Jones University* v. *Johnson*, 396 F. Supp. 597 (SC 1974), affirmance order, 529 F. 2d 514 (CA4 1975).  The current list of programs covered by Title VI includes BEOG's and GSL's, 34 CFR pt. 100, Appendix A (1983), and Grove City's assumption that Congress would have excluded BEOG's from coverage under Title VI if the program had been operational in 1964 is baseless.

termination of "all aid that comes through the Department of Health, Education, and Welfare." 117 Cong. Rec. 30408 (1971).[16] Such statements by individual legislators should not be given controlling effect, but, at least in instances where they are consistent with the plain language of Title IX, Senator Bayh's remarks are "an authoritative guide to the statute's construction." *North Haven Board of Education* v. *Bell*, 456 U. S., at 527. The contemporaneous legislative history, in short, provides no basis for believing that Title IX's broad language is somehow inconsistent with Congress' underlying intent. See also 20 U. S. C. § 1094(a)(3) (1982 ed.).

Persuasive evidence of Congress' intent concerning student financial aid may also be gleaned from its subsequent treatment of Title IX. We have twice recognized the probative value of Title IX's unique postenactment history, *North Haven Board of Education* v. *Bell, supra,* at 535; *Cannon* v. *University of Chicago, supra,* at 687, n. 7, 702–703, and we

---

[16] See 117 Cong. Rec. 30158–30159 (1971) (Sen. McGovern); *id.*, at 39260 (Rep. Erlenborn); 118 Cong. Rec. 5814 (1972) (Sen. Bentsen). Grove City relies heavily on a colloquy between Senators Bayh and Dominick:

"Mr. DOMINICK. The Senator is talking about every program under HEW?

"Mr. BAYH. Let me suggest that I would imagine that any person who was sitting at the head of [HEW], administering this program, would be reasonable and would use only such leverage as was necessary against the institution.

"It is unquestionable, in my judgment, that this would not be directed at specific assistance that was being received by individual students, but would be directed at the institution, and the Secretary would be expected to use good judgment as to how much leverage to apply, and where it could best be applied." 117 Cong. Rec. 30408 (1971).

Grove City contends that Senator Bayh's statement demonstrates an intent to exclude student aid from coverage under Title IX. We believe that his answer is more plausibly interpreted as suggesting that, although the Secretary is empowered to terminate student aid, he probably would not need to do so where leverage could be exerted by terminating other assistance. The students, of course, always remain free to take their assistance elsewhere.

do so once again. The Department's sex discrimination regulations made clear that "[s]cholarships, loans, [and] grants . . . extended directly to . . . students for payment to" an institution constitute federal financial assistance to that entity. 40 Fed. Reg. 24137 (1975); see n. 6, *supra*. Under the statutory "laying before" procedure of the General Education Provisions Act, Pub. L. 93–380, 88 Stat. 567, as amended, 20 U. S. C. § 1232(d)(1) (1982 ed.), Congress was afforded an opportunity to invalidate aspects of the regulations it deemed inconsistent with Title IX.[17] The regulations were clear, and Secretary Weinberger left no doubt concerning the Department's position that "the furnishing of student assistance to a student who uses it at a particular institution . . . [is] Federal aid which is covered by the statute."[18] Yet, neither House passed a disapproval resolution. Congress' failure to disapprove the regulations is not dispositive, but, as we recognized in *North Haven Board of Education* v. *Bell, supra,* at 533–534, it strongly implies that the regulations accurately reflect congressional intent. Congress has never disavowed this implication and in fact has acted consistently with it on a number of occasions.[19]

---

[17] The statutory "laying before" procedure and the actions taken by Congress pursuant to it were more completely summarized in *North Haven Board of Education* v. *Bell,* 456 U. S., at 531–534.

[18] Sex Discrimination Regulations: Hearings before the Subcommittee on Postsecondary Education of the House Committee on Education and Labor, 94th Cong., 1st Sess., 482 (1975) (1975 Hearings). The Secretary added:

"Our view was that student assistance, assistance that the Government furnishes, that goes directly or indirectly to an institution is Government aid within the meaning of Title IX. If it is not, there is an easy remedy. Simply tell us that it is not. We believe it is and base our assumption on that." *Id.*, at 484.

[19] Although "Congress has proceeded to amend § 901 when it has disagreed with HEW's interpretation of the statute," *North Haven Board of Education* v. *Bell, supra,* at 534, it has acquiesced in the Department's longstanding assessment of the types of federal aid that trigger coverage under Title IX. In considering the 1976 Education Amendments, for ex-

With the benefit of clear statutory language, powerful evidence of Congress' intent, and a longstanding and coherent administrative construction of the phrase "receiving Federal financial assistance," we have little trouble concluding that Title IX coverage is not foreclosed because federal funds are

ample, Congress rejected an amendment proposed by Senator McClure that would have defined federal financial assistance as "assistance received by the institution directly from the federal government." 122 Cong. Rec. 28144 (1976). Senator Pell objected that the amendment would remove from the scope of Title IX funds provided under the BEOG program and pointed out that, "[w]hile these dollars are paid to students they flow through and ultimately go to institutions of higher education . . . ." *Id.*, at 28145. Senator Bayh raised a similar objection, *id.*, at 28145–28146, and the amendment was rejected. *Id.*, at 28147. See also *id.*, at 28013–28016 (treatment of Hatfield amendment).

It is also significant that in 1976 Congress enacted legislation clarifying the intent of the Privacy Act to ensure that institutions serving as payment agents for the BEOG program are not considered contractors maintaining a system of records to accomplish a function of the Secretary. Pub. L. 94–328, § 2(f), 90 Stat. 727, 20 U. S. C. § 1070a(c). This legislation responded to concerns expressed by educational institutions over "the additional and unnecessary administrative burdens which would be imposed upon them if [they] were deemed 'contractors.'" S. Rep. No. 94–954, p. 3 (1976). In sharp contrast, Congress has failed to respond to repeated requests by colleges in Grove City's position for legislation exempting them from coverage under Title IX.

The statutory authorization for BEOG's, moreover, has been renewed three times. Pub. L. 94–482, § 121(a), 90 Stat. 2091; Pub. L. 95–566, § 2, 92 Stat. 2402; Pub. L. 96–374, § 402(a), 94 Stat. 1401. Each time, Congress was well aware of the administrative interpretation under which such grants were believed to trigger coverage under Title IX. The history of these reenactments makes clear that Congress regards BEOG's and other forms of student aid as a critical source of support for educational institutions. See, *e. g.*, Reauthorization of the Higher Education Act and Related Measures: Hearings before the Subcommittee on Postsecondary Education of the House Committee on Education and Labor, 96th Cong., 1st Sess., pt. 3, p. 400 (1979) (Rep. Ford). In view of Congress' consistent failure to amend either Title IX or the BEOG statute in a way that would support Grove City's argument, we feel fully justified in concluding that "the legislative intent has been correctly discerned." *North Haven Board of Education* v. *Bell, supra,* at 535.

granted to Grove City's students rather than directly to one of the College's educational programs. There remains the question, however, of identifying the "education program or activity" of the College that can properly be characterized as "receiving" federal assistance through grants to some of the students attending the College.[20]

## III

An analysis of Title IX's language and legislative history led us to conclude in *North Haven Board of Education* v. *Bell*, 456 U. S., at 538, that "an agency's authority under Title IX both to promulgate regulations and to terminate funds is subject to the program-specific limitations of §§ 901 and 902." Although the legislative history contains isolated suggestions that entire institutions are subject to the nondis-

---

[20] JUSTICE STEVENS' assertion that we need not decide and have no jurisdiction to decide this question is puzzling. Title IX coverage is triggered only when an "education program or activity" is receiving federal aid. Unless such a program can be and is identified, there is no basis for ordering the College to execute an Assurance of Compliance. The Court of Appeals understood as much and ruled that the entire College is the covered educational program. Until and unless that view of the statute is overturned, there will be outstanding an authoritative Court of Appeals' judgment that the certificate Grove City must execute relates to the entire College and that without such a certificate the Department would be entitled to terminate grants to Grove City students.

Grove City asks to be relieved of that judgment on the grounds that none of its educational programs is receiving any federal aid and that if any of its programs is receiving aid, it is only its administration of the BEOG program. Grove City is entitled to have these issues addressed, for otherwise it must deal with the undisturbed judgment of the Court of Appeals that the entire College is subject to federal oversight under Title IX. Even though the Secretary has changed his position and no longer agrees with the expansive construction accorded the statute by the Court of Appeals, it is still at odds with Grove City as to the extent of the covered program; and, in any event, its modified stance can hardly overturn or modify the judgment below or eliminate Grove City's legitimate and substantial interest in having its submissions adjudicated.

crimination provision whenever one of their programs receives federal assistance, see 1975 Hearings 178 (Sen. Bayh), we cannot accept the Court of Appeals' conclusion that in the circumstances present here Grove City itself is a "program or activity" that may be regulated in its entirety. Nevertheless, we find no merit in Grove City's contention that a decision treating BEOG's as "Federal financial assistance" cannot be reconciled with Title IX's program-specific language since BEOG's are not tied to any specific "education program or activity."

If Grove City participated in the BEOG program through the RDS, we would have no doubt that the "education program or activity receiving Federal financial assistance" would not be the entire College; rather, it would be its student financial aid program.[21] RDS institutions receive federal funds directly, but can use them only to subsidize or expand their financial aid programs and to recruit students who might otherwise be unable to enroll. In short, the assistance is earmarked for the recipient's financial aid program. Only by ignoring Title IX's program-specific language could we conclude that funds received under the RDS, awarded to eligible students, and paid back to the school when tuition comes due represent federal aid to the entire institution.

We see no reason to reach a different conclusion merely because Grove City has elected to participate in the ADS. Although Grove City does not itself disburse students' awards, BEOG's clearly augment the resources that the College itself

---

[21] There is no merit to Grove City's argument that the Department may regulate only the administration of the BEOG program. Just as employees who "work in an education program that receive[s] federal assistance," *North Haven Board of Education* v. *Bell*, 456 U. S., at 540, are protected under Title IX even if their salaries are "not funded by federal money," *ibid.*, so also are students who participate in the College's federally assisted financial aid program but who do not themselves receive federal funds protected against discrimination on the basis of sex.

devotes to financial aid. As is true of the RDS, however, the fact that federal funds eventually reach the College's general operating budget cannot subject Grove City to institution-wide coverage. Grove City's choice of administrative mechanisms, we hold, neither expands nor contracts the breadth of the "program or activity"—the financial aid program—that receives federal assistance and that may be regulated under Title IX.

To the extent that the Court of Appeals' holding that BEOG's received by Grove City's students constitute aid to the entire institution rests on the possibility that federal funds received by one program or activity free up the College's own resources for use elsewhere, the Court of Appeals' reasoning is doubly flawed. First, there is no evidence that the federal aid received by Grove City's students results in the diversion of funds from the College's own financial aid program to other areas within the institution.[22] Second, and more important, the Court of Appeals' assumption that Title IX applies to programs receiving a larger share of a school's own limited resources as a result of federal assistance earmarked for use elsewhere within the institution is inconsistent with the program-specific nature of the statute. Most federal educational assistance has economic ripple effects throughout the aided institution, and it would be difficult, if not impossible, to determine which programs or activities derive such indirect benefits. Under the Court of Appeals'

---

[22] Until 1980, institutions whose students received BEOG's and other forms of assistance were required to provide assurance that they would "continue to spend on [their] own scholarship and student-aid program[s], from sources other than funds received under [the federal programs], not less than the average expenditure per year made for that purpose during the most recent period of three fiscal years." 20 U. S. C. § 1088c.

This requirement was altered in the Education Amendments of 1980, Pub. L. 96–374, § 487(a), 94 Stat. 1451, 20 U. S. C. § 1094(a)(2) (1982 ed.), and no longer applies to schools whose students receive only BEOG's.

theory, an entire school would be subject to Title IX merely because one of its students received a small BEOG or because one of its departments received an earmarked federal grant. This result cannot be squared with Congress' intent.

The Court of Appeals' analogy between student financial aid received by an educational institution and nonearmarked direct grants provides a more plausible justification for its holding, but it too is faulty. Student financial aid programs, we believe, are *sui generis*. In neither purpose nor effect can BEOG's be fairly characterized as unrestricted grants that institutions may use for whatever purpose they desire. The BEOG program was designed, not merely to increase the total resources available to educational institutions, but to enable them to offer their services to students who had previously been unable to afford higher education. It is true, of course, that substantial portions of the BEOG's received by Grove City's students ultimately find their way into the College's general operating budget and are used to provide a variety of services to the students through whom the funds pass. However, we have found no persuasive evidence suggesting that Congress intended that the Department's regulatory authority follow federally aided students from classroom to classroom, building to building, or activity to activity. In addition, as Congress recognized in considering the Education Amendments of 1972, the economic effect of student aid is far different from the effect of nonearmarked grants to institutions themselves since the former, unlike the latter, increases both an institution's resources and its obligations. See Pub. L. 92–318, § 1001(a), 86 Stat. 375, 20 U. S. C. § 1070e; S. Rep. No. 92–346, p. 43 (1971); 118 Cong. Rec. 20331 (1972) (Rep. Badillo). In that sense, student financial aid more closely resembles many earmarked grants.

We conclude that the receipt of BEOG's by some of Grove City's students does not trigger institutionwide coverage under Title IX. In purpose and effect, BEOG's represent

federal financial assistance to the College's own financial aid program, and it is that program that may properly be regulated under Title IX.

## IV

Since Grove City operates an "education program or activity receiving Federal financial assistance," the Department may properly demand that the College execute an Assurance of Compliance with Title IX. 34 CFR § 106.4 (1983). Grove City contends, however, that the Assurance it was requested to sign was invalid, both on its face and as interpreted by the Department, in that it failed to comport with Title IX's program-specific character. Whatever merit that objection might have had at the time, it is not now a valid basis for refusing to execute an Assurance of Compliance.

The Assurance of Compliance regulation itself does not, on its face, impose institutionwide obligations. Recipients must provide assurance only that "each education program or activity operated by . . . [them] *and to which this part applies* will be operated in compliance with this part." 34 CFR § 106.4 (1983) (emphasis added). The regulations apply, by their terms, "to every recipient and to *each education program or activity* operated by such recipient *which receives or benefits from Federal financial assistance.*" 34 CFR § 106.11 (1983) (emphasis added). These regulations, like those at issue in *North Haven Board of Education* v. *Bell,* 456 U. S. 512 (1982), "conform with the limitations Congress enacted in §§ 901 and 902." *Id.,* at 539. Nor does the Department now claim that its regulations reach beyond the College's student aid program. Furthermore, the Assurance of Compliance currently in use, like the one Grove City refused to execute, does not on its face purport to reach the entire College; it certifies compliance with respect to those "education programs and activities receiving Federal financial assistance." See n. 2, *supra.* Under this opinion, consistent with the program-specific requirements of Title IX,

the covered education program is the College's financial aid program.

A refusal to execute a proper program-specific Assurance of Compliance warrants termination of federal assistance to the student financial aid program. The College's contention that termination must be preceded by a finding of actual discrimination finds no support in the language of § 902, which plainly authorizes that sanction to effect "[c]ompliance with any requirement adopted pursuant to this section." Regulations authorizing termination of assistance for refusal to execute an Assurance of Compliance with Title VI had been promulgated, 45 CFR § 80.4 (Supp., Jan. 1, 1965), and upheld, *Gardner* v. *Alabama*, 385 F. 2d 804 (CA5 1967), cert. denied, 389 U. S. 1046 (1968), long before Title IX was enacted, and Congress no doubt anticipated that similar regulations would be developed to implement Title IX. 118 Cong. Rec. 5807 (1972) (Sen. Bayh). We conclude, therefore, that the Department may properly condition federal financial assistance on the recipient's assurance that it will conduct the aided program or activity in accordance with Title IX and the applicable regulations.

## V

Grove City's final challenge to the Court of Appeals' decision—that conditioning federal assistance on compliance with Title IX infringes First Amendment rights of the College and its students—warrants only brief consideration. Congress is free to attach reasonable and unambiguous conditions to federal financial assistance that educational institutions are not obligated to accept. *E. g.*, *Pennhurst State School and Hospital* v. *Halderman*, 451 U. S. 1, 17 (1981). Grove City may terminate its participation in the BEOG program and thus avoid the requirements of § 901(a). Students affected by the Department's action may either take their BEOG's elsewhere or attend Grove City without federal financial assistance. Requiring Grove City to comply with Title IX's

prohibition of discrimination as a condition for its continued eligibility to participate in the BEOG program infringes no First Amendment rights of the College or its students.

Accordingly, the judgment of the Court of Appeals is

*Affirmed.*

JUSTICE POWELL, with whom THE CHIEF JUSTICE and JUSTICE O'CONNOR join, concurring.

As I agree that the holding in this case is dictated by the language and legislative history of Title IX, and the regulations of the Department of Education, I join the Court's decision. I do so reluctantly and write briefly to record my view that the case is an unedifying example of overzealousness on the part of the Federal Government.

Grove City College (Grove City) may be unique among colleges in our country; certainly there are few others like it. Founded more than a century ago in 1876, Grove City is an independent, coeducational liberal arts college. It describes itself as having "both a Christian world view and a freedom philosophy," perceiving these as "interrelated." App. A–22. At the time of this suit, it had about 2,200 students and tuition was surprisingly low for a private college.[1] Some 140 of the College's students were receiving Basic Educational Opportunity Grants (BEOG's),[2] and 342 had obtained Guaranteed Student Loans (GSL's).[3] The grants were made directly to the students through the Department of Education, and the student loans were guaranteed by the Federal Government. Apart from this indirect assistance, Grove City has followed an unbending policy of refusing all forms of government assistance, whether federal, state, or local. It was and is the policy of this small college to remain wholly inde-

---

[1] Yearly tuition for 1983 for fees, room, and board was $4,270. Brief for Petitioners 3, n. 2.

[2] *Grove City College* v. *Harris*, 500 F. Supp. 253, 259 (WD Pa. 1980).

[3] *Ibid.*

pendent of government assistance, recognizing—as this case well illustrates—that with acceptance of such assistance one surrenders a certain measure of the freedom that Americans always have cherished.

This case involves a regulation adopted by the Department to implement § 901(a) of Title IX (20 U. S. C. § 1681(a)). It is well to bear in mind what § 901(a) provides:

> "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance . . . ."

The sole purpose of the statute is to make unlawful *"discrimination"* by recipients of federal financial assistance on the "basis of sex." The undisputed fact is that Grove City does not discriminate—and so far as the record in this case shows—never has discriminated against anyone on account of sex, race, or national origin. This case has nothing whatever to do with discrimination past or present. The College therefore has complied to the letter with the sole purpose of § 901(a).

As the Court describes, the case arises pursuant to a regulation adopted under Title IX that authorizes the Secretary to obtain from recipients of federal aid an "Assurance of Compliance" with Title IX and regulations issued thereunder. At the outset of this litigation, the Department insisted that by accepting students who received BEOG awards, Grove City's entire institution was subject to regulation under Title IX. The College, in view of its policies and principles of independence and its record of nondiscrimination, objected to executing this Assurance. One would have thought that the Department, confronted as it is with cases of national importance that involve actual discrimination, would have respected the independence and admirable record of this College. But common sense and good judgment failed to pre-

vail. The Department chose to litigate, and instituted an administrative proceeding to compel Grove City to execute an agreement to operate all of its programs and activities in full compliance with all of the regulations promulgated under Title IX—despite the College's record as an institution that had operated to date in full accordance with the letter and spirit of Title IX. The Administrative Law Judge who heard the case on September 15, 1978, did not relish his task.

On the basis of the evidence, which included the formal published statement of Grove City's strong "nondiscrimination policy," he stated:

> "It should also be noted that there was *not the slightest hint of any failure to comply with Title IX* save the refusal to submit an executed assurance of compliance with Title IX. This refusal is obviously a matter of conscience and belief." App. to Pet. for Cert. A–94 (emphasis added).[4]

The Administrative Law Judge further evidenced his reluctance by emphasizing that the regulations were "binding" upon him. *Id.*, at A–95. He concluded that the scholarship grants and student loans to Grove City constituted indirect "federal financial assistance," and in view of the failure of Grove City to execute the Assurance, the regulation required that the grants and loans to its students must be "terminated." *Id.*, at A–96. The College and four of its students then instituted this suit in 1978 challenging the validity of the regulations and seeking a declaratory judgment.

The effect of the Department's termination of the student grants and loans would not have been limited to the College itself. Indeed, the most direct effect would have been upon the students themselves. Absent the availability of other scholarship funds, many of them would have had to abandon their college education or choose another school. It was to

---

[4] These findings of the Administrative Law Judge have not been questioned.

avoid these serious consequences, that this suit was instituted. The College prevailed in the District Court but lost in the Court of Appeals. Only after Grove City had brought its case before this Court, did the Department retreat to its present position that Title IX applies only to Grove City's financial aid office. On this narrow theory, the Department has prevailed, having taken this small independent college, which it acknowledges has engaged in no discrimination whatever, through six years of litigation with the full weight of the Federal Government opposing it. I cannot believe that the Department will rejoice in its "victory."

JUSTICE STEVENS, concurring in part and concurring in the result.

For two reasons, I am unable to join Part III of the Court's opinion. First, it is an advisory opinion unnecessary to today's decision, and second, the advice is predicated on speculation rather than evidence.

The controverted issue in this litigation is whether Grove City College may be required to execute the "Assurance of Compliance with Title IX" tendered to it by the Secretary in order to continue receiving the benefits of the federal financial assistance provided by the BEOG program. The Court of Appeals affirmed the District Court's decision that Grove City is a "recipient" of federal financial assistance, and reversed its decision that the Secretary could not terminate federal financial assistance because Grove City refused to execute the Assurance. The Court today holds (in Part II of its opinion) that Grove City is a recipient of federal financial assistance within the meaning of Title IX, and (in Part IV) that Grove City must execute the Assurance of Compliance in order to continue receiving that assistance. These holdings are fully sufficient to sustain the judgment the Court reviews, as the Court acknowledges by affirming that judgment.

In Part III of its opinion, the Court holds that Grove City is not required to refrain from discrimination on the basis of

sex except in its financial aid program. In so stating, the Court decides an issue that is not in dispute. The Assurance of Compliance merely requires that it comply with Title IX "to the extent applicable to it." See *ante*, at 560. The Secretary, who is responsible for administering Title IX, construes the statute as applicable only to Grove City's financial aid program. All the Secretary seeks is a judgment that Title IX requires Grove City to promise not to discriminate in its financial aid program. The Court correctly holds that this program is subject to the requirements of Title IX, and that Grove City must promise not to discriminate in its operation of the program. But, there is no reason for the Court to hold that Grove City need not make a promise that the Secretary does not ask it to make, and that it in fact would not be making by signing the Assurance, in order to continue to receive federal financial assistance. It will be soon enough to decide the question discussed in Part III when and if the day comes that the Secretary asks Grove City to make some further promise in order to continue to receive federal financial assistance.

Moreover, the record in this case is far from adequate to decide the question raised in Part III. See *Consolidated Rail Corp.* v. *Darrone, post,* at 635–636. Assuming for the moment that participation in the BEOG program could not in itself make Title IX applicable to the entire institution, a factual inquiry is nevertheless necessary as to which of Grove City's programs and activities can be said to receive or benefit from federal financial assistance. This is the import of the applicable regulation, upheld by the Court today, *ante,* at 574–575, which states that Title IX applies "to every recipient and to each education program or activity operated by such recipient which receives or benefits from Federal financial assistance." 34 CFR § 106.11 (1983). The Court overlooks the fact that the regulation is in the disjunctive; Title IX coverage does not always depend on the actual receipt of federal financial assistance by a given program or activity. The record does not tell us how important the BEOG pro-

gram is to Grove City, in either absolute or relative terms; nor does it tell us anything about how the benefits of the program are allocated within the institution. The Court decides that a small scholarship for just one student should not subject the entire school to coverage. *Ante,* at 572–573. But why should this case be judged on the basis of that hypothetical example instead of a different one? What if the record showed—and I do not suggest that it does—that all of the BEOG money was reserved for, or merely happened to be used by, talented athletes and that their tuition payments were sufficient to support an entire athletic program that would otherwise be abandoned? Would such a hypothetical program be covered by Title IX?* And if this athletic program discriminated on the basis of sex, could it plausibly be contended that Congress intended that BEOG money could be used to enable such a program to survive? Until we know something about the character of the particular program, it is inappropriate to give advice about an issue that is not before us.

Accordingly, while I subscribe to the reasoning in Parts I, II, IV, and V of the Court's opinion, I am unable to join Part III.

JUSTICE BRENNAN, with whom JUSTICE MARSHALL joins, concurring in part and dissenting in part.

The Court today concludes that Grove City College is "receiving Federal financial assistance" within the meaning of Title IX of the Education Amendments of 1972, 20 U. S. C.

---

*Indeed, if we are to speculate about hypothetical cases, why not consider a school comparable to the private institutions discussed in *Blum* v. *Yaretsky,* 457 U. S. 991 (1982), in which over 90% of the patients received funds from public sources? See *id.,* at 1011. It is at least theoretically possible that an educational institution might be financed entirely by tuition, and that virtually all of the students at an institution could receive a federal subsidy. Again, I do not suggest that Grove City College is such an institution, but I do suggest that it is improper for the Court to decide a legal issue on the basis of hypothetical examples that are selected to support a particular result.

§ 1681(a), because a number of its students receive federal education grants. As the Court persuasively demonstrates in Part II of its opinion, that conclusion is dictated by "the need to accord [Title IX] a sweep as broad as its language," *ante,* at 564; by reference to the analogous statutory language and legislative history of Title VI of the Civil Rights Act of 1964, *ante,* at 566; by reliance on the unique post-enactment history of Title IX, *ante,* at 567–568; and by recognition of the strong congressional intent that there is no "substantive difference between direct institutional assistance and aid received by a school through its students," *ante,* at 564, 565–566, 569–570, and nn. 12–14, 19. For these same reasons, however, I cannot join Part III of the Court's opinion, in which the Court interprets the language in Title IX that limits application of the statute to "any education program or activity" receiving federal moneys. By conveniently ignoring these controlling indicia of congressional intent, the Court also ignores the primary purposes for which Congress enacted Title IX. The result—allowing Title IX coverage for the College's financial aid program, but rejecting institutionwide coverage even though federal moneys benefit the entire College—may be superficially pleasing to those who are uncomfortable with federal intrusion into private educational institutions, but it has no relationship to the statutory scheme enacted by Congress.

## I

The Court has twice before had occasion to ascertain the precise scope of Title IX. See *North Haven Board of Education* v. *Bell,* 456 U. S. 512 (1982); *Cannon* v. *University of Chicago,* 441 U. S. 677 (1979). In both cases, the Court emphasized the broad congressional purposes underlying enactment of the statute. In *Cannon,* while holding that Title IX confers a private cause of action on individual plaintiffs, we noted that the primary congressional purpose behind the statute was "to avoid the use of federal resources to support discriminatory practices," and that this purpose "is generally

served by the statutory procedure for the termination of federal financial support for institutions engaged in discriminatory practices." *Id.*, at 704. In *North Haven*, while holding that employment discrimination is within the reach of Title IX, we expressed "no doubt that 'if we are to give [Title IX] the scope that its origins dictate, we must accord it a sweep as broad as its language.'" 456 U. S., at 521 (quoting *United States* v. *Price*, 383 U. S. 787, 801 (1966)). And although we acknowledged that an agency's authority "both to promulgate regulations and to terminate funds is subject to the program-specific limitation of §§ 901 and 902," 456 U. S., at 538, we explicitly refused to define "program" at that time, *id.*, at 540.

When reaching that question today,[1] the Court completely disregards the broad remedial purposes of Title IX that consistently have controlled our prior interpretations of this civil rights statute. Moreover, a careful examination of the statute's legislative history, the accepted meaning of similar statutory language in Title VI, and the postenactment history of Title IX will demonstrate that the Court's narrow definition of "program or activity" is directly contrary to congressional intent.

### A

The statute that was eventually enacted as Title IX had its genesis in separate proposals considered by the House and the Senate, in 1970 and 1971, respectively. In the House, the Special Subcommittee on Education, under the leadership of Representative Edith Green, held extensive hearings during the summer of 1970 on "Discrimination Against

---

[1] There is much to commend the suggestion, made by JUSTICE STEVENS, that Part III of the Court's opinion is no more than an advisory opinion, unnecessary to the resolution of this case and unsupported by any factual findings made below. See *ante*, p. 579 (concurring in part and concurring in result). Because the Court has not heeded that suggestion, however, I feel compelled to express my view on the merits of the issue decided by the Court.

Women." See Hearings on § 805 of H. R. 16098 before the Special Subcommittee on Education of the House Committee on Education and Labor, 91st Cong., 2d Sess. (1970) (1970 Hearings). At that time, the Subcommittee was considering a package of legislation that included a simple amendment adding the word "sex" to the list of discriminations prohibited by Title VI of the Civil Rights Act of 1964, 42 U. S. C. § 2000d.[2] See *North Haven, supra,* at 523, n. 13; *Cannon, supra,* at 694, n. 16. Testimony offered during those hearings, however, focused on the evidence of pervasive sex discrimination in educational institutions.[3] It therefore was not surprising that the version of the Subcommittee's

---

[2] The prohibitory section of Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." For reasons explained *infra,* at 585–586, the version of Title IX that was eventually enacted by Congress is for all relevant purposes identical to this provision. See *ante,* at 557, n. 1, for the text of Title IX.

[3] Also during those hearings, representatives of the Executive Branch first raised objections about the expansive reach of the proposal being considered by the Subcommittee. Specifically, it was noted by witnesses testifying on behalf of the Department of Health, Education, and Welfare that the proposed legislation would apply to institutions that were traditionally noncoeducational and to facilities and services within an institution, such as dormitories or physical recreation areas, that might properly be limited to one sex. See, *e. g.,* 1970 Hearings, at 657 (statement of Peter Muirhead, Associate Commissioner for Higher Education). See also *id.,* at 674 (statement of Frankie M. Freeman, Commissioner, U. S. Commission on Civil Rights). To eliminate this alleged overreaching, the Department of Justice offered its own legislation that was recognized at the time as far *narrower* in its reach than the Subcommittee's proposal. Nonetheless, even with this more limited scope, the alternative offered by the administration would have prohibited sex-based discrimination by a "recipient of Federal financial assistance for any education program or activity," H. R. 5191, 92d Cong., 1st Sess., § 1001(a) (1971), and would have covered facilities or services at educational institutions that did not themselves receive direct educational grants. See, *e. g.,* 1970 Hearings, at 678 (testimony of Jerris Leonard, Assistant Attorney General, Civil Rights Division). The administration proposal was eventually rejected by the full House in favor of the bill reported by Representative Green and her Subcommittee.

proposal that was eventually passed by the full House was limited in its application to federally assisted *education* programs or activities. See 117 Cong. Rec. 39248–39261, 39353–39354 (1971). More important for present purposes, however, the House-passed bill retained the overall format of the Subcommittee proposal, and therefore continued to incorporate the "program or activity" language and its enforcement provisions from Title VI. *Id.*, at 39364–39365.

In the Senate, action began on Title IX in 1971, when Senator Bayh first introduced a floor amendment to the comprehensive education legislation then being considered. Amendment No. 398 to Higher Education Act of 1971, reprinted in 117 Cong. Rec. 30156 (1971). As then written, Senator Bayh's proposal was clearly intended to cover an entire institution whenever any education program or activity conducted by that institution was receiving federal moneys. In particular, the amendment expressly prohibited discrimination on the basis of sex "under any program or activity conducted by a public institution of higher education, or any school or department of graduate education, which is a recipient of Federal financial assistance for any education program or activity." As explained by its sponsor, the amendment would have prohibited sex discrimination "by any public institution of higher education or any institution of graduate education receiving Federal educational financial assistance." *Id.*, at 30157.[4]

The 1971 amendment was eventually ruled nongermane, *id.*, at 30415, so Senator Bayh was forced to renew his efforts during the next session. When reintroduced, the amendment had been modified to conform in substantial part with the version of Title IX that had been passed by the House. See 118 Cong. Rec. 5803 (1972). This change was apparently made to ensure adoption of the antidiscrimination provisions by the Conference Committee that would soon

---

[4] See also 117 Cong. Rec. 30408 (1971) ("I doubt very much whether even one institution of higher education today, private or public, is not receiving some Federal assistance") (remarks of Sen. Bayh).

convene. See *id.*, at 5813 (remarks of Sen. Pell, principal Senate Manager of the bill) ("As [Senator Bayh] knows, I said to him earlier that I intended to support the position he has advocated in conference with the House. He has chosen to bring the amendment before the Senate now"). There is thus nothing to suggest that the Senate had retreated from the underlying premise of the original amendment proposed by Senator Bayh in 1971—that sex discrimination would be prohibited in any educational institution receiving federal financial assistance. Indeed, Senator Bayh's willingness to conform the language of his amendment to the bill already enacted by the House proved successful, as Title IX was approved by the Conference Committee, see S. Conf. Rep. No. 92–798, pp. 221–222 (1972), and enacted into law.

In sum, although the contemporaneous legislative history does not definitively explain the intended meaning of the program-specific language included in Title IX, it lends no support to the interpretation adopted by the Court. What is clear, moreover, is that Congress intended enforcement of Title IX to mirror the policies and procedures utilized for enforcement under Title VI.

## B

"Title IX was patterned after Title VI of the Civil Rights Act of 1964." *Cannon*, 441 U. S., at 694. Except for the substitution of the word "sex" in Title IX to replace the words "race, color, or national origin" in Title VI, and for the limitation of Title IX to "education" programs or activities, the two statutes use identical language to describe their scope. The interpretation of this critical language as it already existed under Title VI is therefore crucial to an understanding of congressional intent in 1972 when Title IX was enacted using the same language.

The voluminous legislative history of Title VI is not easy to comprehend, especially when one considers the emotionally and politically charged atmosphere operating at the time of its enactment. And there are no authoritative committee re-

ports explaining the many compromises that were eventually enacted, including the program-specific limitations that found their way into Title VI. Moreover, as might be expected, statements were made by various Members of Congress that can be cited to support a whole range of definitions for the "program or activity" language. For every instance in which a legislator equated the word "program" with a particular grant statute,[5] there is an example of a legislator defining "program or activity" more broadly.[6]

Without completely canvassing several volumes of the Congressional Record, I believe it is safe to say that, by including the programmatic language in Title VI, Congress sought to allay fears on the part of many legislators that one isolated violation of the statute's antidiscrimination provisions would result in the wholesale termination of federal funds. In particular, "Congress was primarily concerned with two facets of the termination power: the possibility that noncompliance in a single school district might lead to termination of funds to the entire state; and the possibility that discrimination in the education program might result in the termination of federal assistance to unrelated federally financed programs, such as highways." Comment, 118 U. Pa. L. Rev. 1113, 1119–1120 (1970) (footnotes omitted). See id., at 1116–1124. See also 687 F. 2d 684, 697–698 (CA3 1982).

But even accepting that there is some uncertainty concerning the 1964 understanding of "program or activity," we need not be overly concerned with whatever doubt surrounds the precise intent, if any, of the 88th Congress. For what is crucial in ascertaining the meaning of the program-specific lan-

---

[5] See, e. g., 110 Cong. Rec. 7100–7101 (1964) (remarks of Sen. Javits); id., at 8359–8361 (remarks of Sen. Eastland); id., at 13331 (remarks of Sen. Gore).

[6] See, e. g., id., at 7059 (1964) (remarks of Sen. Pastore); id., at 7063 (remarks of Sen. Pastore); id., at 7067 (remarks of Sen. Ribicoff); id., at 8507–8508 (remarks of Sens. Smathers and Allott); id., at 12714–12715 (remarks of Sen. Humphrey); id., at 12818 (statement of Sen. Dirksen); id., at 14330–14331 (remarks of Sen. Williams).

guage included in Title IX is the understanding that the 92d Congress had at the time it enacted the identical language. Cf. *Cannon, supra,* at 696–698. And there were two principal indicators of the accepted interpretation of the program-specific language in Title VI that were available to Members of Congress in 1972 when Title IX was enacted—the existing administrative regulations promulgated under Title VI, and the available judicial decisions that had already interpreted those provisions.

The Title VI regulations first issued by the Department of Health, Education, and Welfare during the 1960's, and remaining in effect during 1972, could not have been clearer in the way they applied to educational institutions. See generally 45 CFR pt. 80 (1972). For example, § 80.4(d) explained the assurances required from, among others, institutions of higher education that received federal financial assistance:

> "(d) *Assurances from institutions.* (1) In the case of any application for Federal financial assistance to an institution of higher education (including assistance for construction, for research, for a special training project, for a student loan program, or for any other purpose), the assurance required by this section shall extend to admission practices *and to all other practices relating to the treatment of students.*

> "(2) The assurance required with respect to an institution of higher education, . . . insofar as the assurance relates to the institution's practices with respect to admission or other treatment of individuals as students, . . . or to the opportunity to participate in the provision of services or other benefits to such individuals, *shall be applicable to the entire institution unless the applicant establishes, to the satisfaction of the responsible Department official, that the institution's practices in designated parts or programs of the institution will in no way affect its practices in the program of the institution for*

*which Federal financial assistance is sought, or the beneficiaries of or participants in such program. If in any such case the assistance sought is for the construction of a facility or part of a facility, the assurance shall in any event extend to the entire facility and to facilities operated in connection therewith."* (Emphasis added.)

A list of illustrative applications followed that further demonstrated the broad scope of these regulations. One of the illustrations was aimed particularly at institutions of higher education:

"In a research, training, demonstration, or other grant to a university for activities to be conducted in a graduate school, discrimination in the admission and treatment of students in the graduate school is prohibited, and the prohibition extends to the entire university unless it satisfies the responsible Department official that practices with respect to other parts or programs of the university will not interfere, directly or indirectly, with fulfillment of the assurance required with respect to the graduate school." § 80.5(c).[7]

---

[7] Another illustration included in the Department's Title VI regulations referred explicitly to federal moneys granted to elementary and secondary schools:

"In the Federally-affected area programs . . . for construction aid and for general support of the operation of elementary or secondary schools, or in programs for more limited support to such schools such as for the acquisition of equipment, the provision of vocational education, or the provision of guidance and counseling services, discrimination by the recipient school district in any of its elementary or secondary schools in the admission of students, or in the treatment of its students in any aspect of the educational process, is prohibited. In this and the following illustrations the prohibition of discrimination in the treatment of students . . . includes the prohibition of discrimination among the students . . . in the availability or use of any academic, dormitory, eating, recreational, or other facilities of the grantee or other recipient." 45 CFR § 80.5(b) (1972).

It must have been clear to the Congress enacting Title IX, therefore, that the administrative interpretation of that statute would follow a similarly expansive approach. Nothing in the legislative history suggests otherwise; and "[i]t is always appropriate to assume that our elected representatives, like other citizens, know the law." *Cannon*, 441 U. S., at 696–697.

Nor were there any outstanding court decisions in 1972 that would have led Congress to believe that Title VI was much narrower in scope. The principal judicial interpretations of Title VI prior to 1972 were announced by the United States Court of Appeals for the Fifth Circuit. In a school desegregation case, for example, the court expressly approved the Department's desegregation guidelines, while noting the broad purposes underlying the prohibitory section of Title VI. *United States* v. *Jefferson County Board of Education*, 372 F. 2d 836, 881–882 (CA5 1966), adopted en banc, 380 F. 2d 385 (CA5 1967) *(per curiam)* (" 'The legality is based on the general power of Congress to apply reasonable conditions. . . . In general, it seems rather anomalous that the Federal Government should aid and abet discrimination on the basis of race, color or national origin by granting money and other kinds of financial aid' ") (quoting Cong. Celler). In another desegregation case, the court noted that Title VI "states a reasonable condition that the United States may attach to any grant of financial assistance and may enforce by refusal or withdrawal of federal assistance." *Bossier Parish School Board* v. *Lemon*, 370 F. 2d 847, 852 (CA5 1967). More significantly, the court went on to equate a local school system with a "program or activity" receiving federal aid, noting that the "School Board accepted federal financial assistance in November 1964, and thereby brought its school system within the class of programs subject to the section 601 prohibition against discrimination." *Ibid.*

Finally, in *Board of Public Instruction* v. *Finch*, 414 F. 2d 1068 (CA5 1969), the court spoke more directly to the

program-specific limitation in Title VI. Although the court refused "to assume . . . that defects in one part of a school system automatically infect the whole," *id.*, at 1074, and rejected the definition of the term "program" offered by the Department, *id.*, at 1077, the court also noted that "the purpose of the Title VI cutoff is best effectuated by separate consideration of the use or intended use of federal funds under each grant statute," *id.*, at 1078. In particular, although "there will . . . be cases from time to time where a particular program, within a state, within a county, within a district, even within a school . . . , is effectively insulated from otherwise unlawful activities," termination of federal funds is proper if they "are administered in a discriminatory manner, or if they support a program which is infected by a discriminatory environment." *Ibid.* To this end, the court remanded the case to the Department for specific findings on the relationship, if any, between the three types of federal grants received by the school system (federal aid for the education of children from low-income families, for supplementary education centers, and for adult education) and the system's discriminatory practices.

In short, the judicial interpretations of Title VI existing in 1972 were either in agreement with the expansive reach of the Department's regulations, *Bossier Parish, supra; Jefferson County, supra,* or sanctioned a broad-based termination of federal aid if the funded programs were affected by discriminatory practices, *Finch, supra.* See also Note, 55 Geo. L. J. 325, 344–345 (1966) (supporting Department's treatment of a school district as an individual program). Cf. *Lau* v. *Nichols,* 414 U. S. 563, 568 (1974) (treating an entire school system or school district as an "educational program" under Title VI). Like the existing administrative regulations, therefore, they provide strong support for the view that Congress intended an expansive interpretation of the program-specific language included in Title IX. Because Members of Congress "repeated[ly] refer[red] to Title VI and

its modes of enforcement, we are especially justified in presuming both that those representatives were aware of the prior interpretation of Title VI and that that interpretation reflects their intent with respect to Title IX." *Cannon, supra,* at 697–698.

## C

If any doubt remains about the congressional intent underlying the program-specific language included in Title IX, it is removed by the unique postenactment history of the statute. "Although postenactment developments cannot be accorded 'the weight of contemporary legislative history, we would be remiss if we ignored these authoritative expressions concerning the scope and purpose of Title IX. . . .'" *North Haven,* 456 U. S., at 535 (quoting *Cannon, supra,* at 687, n. 7). See also *ante,* at 567–568.

Regulations promulgated by the Department to implement Title IX, both as proposed, 39 Fed. Reg. 22228 (1974), and as finally adopted, 40 Fed. Reg. 24128 (1975), included an interpretation of program specificity consistent with the view of Title VI and with the congressional intent behind Title IX outlined above. In particular, the regulations prohibited sex discrimination "under any academic, extracurricular, research, occupational training, or other education program or activity operated by a recipient which receives or benefits from Federal financial assistance." *Id.,* at 24140 (now codified at 34 CFR § 106.31 (1983)). Introductory remarks explained the basis for the agency's decision:

> "[T]itle IX will be consistent with the interpretation of similar language contained in title VI of the Civil Rights Act of 1964. . . . Therefore, an education program or activity or part thereof operated by a recipient of Federal financial assistance administered by the Department will be subject to the requirements of this regulation if it receives or benefits from such assistance.[8] This inter-

---

[8] In *North Haven,* we concluded that the word "it" in this sentence refers to "education program or activity" rather than "recipient." 456 U. S.,

pretation is consistent with the only case specifically ruling on the language contained in title VI, which holds that Federal funds may be terminated under title VI upon a finding that they '[are] infected by a discriminatory environment.'" 40 Fed. Reg., at 24128 (quoting *Finch*, 414 F. 2d, at 1078–1079).

Thus, the agency charged with the statute's implementation initially interpreted the program-specific language of Title IX in a manner consistent with the view of Congress' intent outlined above—to allow for application of the statute to an entire institution if the institution is comprised of education programs or activities that receive or benefit from federal moneys.

Moreover, pursuant to § 431(d)(1) of the General Education Provisions Act, as amended by Pub. L. 93–380, 88 Stat. 567, these regulations were submitted to Congress for review. As we explained in *North Haven, supra,* at 531–532 (quoting 20 U. S. C. § 1232(d)(1)), this "laying before" procedure afforded Congress an opportunity to disapprove any regulation that it found to be "inconsistent with the Act from which it derives its authority." And although the regulations interpreting the program-specific limitations of Title IX were explicitly considered by both Houses of Congress, no resolutions of disapproval were passed by the Legislature.

In particular, two resolutions to invalidate the Department's regulations were proposed in the Senate, each specifically challenging the regulations because of the program-

---

at 539, n. 30. Even with this limiting construction, however, the regulations still apply to any education program or activity which "receives *or benefits*" from federal assistance. In any event, given the Department's own interpretation of the words quoted in the text, our limiting construction may have been unjustified. See HEW Fact Sheet Accompanying Final Title IX Regulation Implementing Education Amendments of 1972, p. 3 (June 1975) ("Except for the specific limited exemptions set forth below, the final regulation applies to all aspects of all education programs or activities of a school district, institution of higher education, or other entity which receives Federal funds for any of those programs").

specificity requirements of Title IX. One resolution would have provided a blanket disapproval of the regulations, S. Con. Res. 46, 94th Cong., 1st Sess. (1975), premised in part on the view that "[t]he regulations are inconsistent with the enactment in that they apply to programs or activities not receiving Federal funds such as athletics and extracurricular activities," 121 Cong. Rec. 17300 (1975) (remarks of Sen. Helms). The other resolution was aimed more particularly at the regulation of athletic programs and activities not receiving direct federal moneys, but also was premised on the program-specific limitations in the statute. See S. Con. Res. 52, 94th Cong., 1st Sess. (1975).[9] Neither resolution,

---

[9] The sponsor of this second resolution explained the basis for his proposal to his Senate colleagues:

"[T]here is not a college athletic department anywhere in the country that receives Federal funds. The intercollegiate athletics provisions of the regulations are thus inconsistent with the statute in that they impose requirements on college programs not receiving Federal assistance.

"HEW attempts to surmount this obvious inconsistency through recourse to semantics. The statute clearly refers to programs receiving Federal assistance and the courts have established that programs are in fact separable. Yet, HEW argues, when pressed, that its authority includes not only those programs actually receiving Federal assistance but those which indirectly benefit from that assistance as well. Thus, according to this tortious logic, college football receives Federal assistance because it may benefit indirectly from federally guaranteed student loans unrelated to athletics or a student athlete may use the school library whose construction was assisted by Federal funding. Needless to say, this is a rather slender reed upon which to base a social policy of this magnitude." 121 Cong. Rec. 22941 (1975) (remarks of Sen. Laxalt).

Despite this rhetorical flourish, Congress has consistently endorsed the Department's regulation of college athletic programs, and indeed has affirmatively required such regulations. See, e. g., Pub. L. 93–380, § 844, 88 Stat. 612 ("The Secretary shall prepare and publish . . . proposed regulations implementing the provisions of title IX . . . relating to the prohibition of sex discrimination in federally assisted education programs which shall include with respect to intercollegiate athletic activities reasonable provisions considering the nature of particular sports"). See also Brief for Council of Collegiate Women Athletic Administrators as *Amicus Curiae* 4–16. Cf. *Haffer* v. *Temple University*, 524 F. Supp. 531 (ED

however, was acted upon after referral to the appropriate Committee.

In the House, extensive hearings were held by two separate Subcommittees of the Committee on Education and Labor. Of primary interest are the six days of hearings held by the Subcommittee on Postsecondary Education to review the Department's regulations "solely to see if they are consistent with the law and with the intent of the Congress in enacting the law." See Sex Discrimination Regulations: Hearings before the Subcommittee on Postsecondary Education of the House Committee on Education and Labor, 94th Cong., 1st Sess., 1 (1975) (1975 Hearings) (remarks of Rep. O'Hara). Among the numerous witnesses testifying about the programmatic reach of the Department's regulations were Senator Bayh, the chief Senate sponsor of the legislation, see *supra*, at 585–586, and HEW Secretary Weinberger. Both strongly supported the scope of the regulations as consistent with the intent evidenced by the 92d Congress in 1972. See, *e. g.*, 1975 Hearings, at 169–171 (statement of Sen. Bayh); *id.*, at 178 (testimony of Sen. Bayh); *id.*, at 438, 485 (testimony of Secretary Weinberger); *id.*, at 487–488 (letter from Secretary Weinberger).[10] Specifically focusing on

---

Pa. 1981), aff'd, 688 F. 2d 14 (CA3 1982). The opinion for the Court, limited as it is to a college that receives only "[s]tudent financial aid . . . [that] is *sui generis*," *ante*, at 573, obviously does not decide whether athletic programs operated by colleges receiving other forms of federal financial assistance are within the reach of Title IX. Cf. 688 F. 2d, at 15, n. 5 (discussing the many forms of federal aid received by Temple University and its athletic department).

[10] See also, *e. g.*, 1975 Hearings, at 90 (testimony of Kathy Kelly, President, U. S. National Student Association); *id.*, at 163–166 (testimony of Rep. Mink); *id.*, at 187–191 (memorandum of American Law Division, Library of Congress); *id.*, at 191–196 (memorandum of Center for National Policy Review); *id.*, at 284–285 (statement of Norma Raffel, Head, Education Committee, Women's Equity Action League); *id.*, at 385–388 (testimony of Dr. Bernice Sandler, Director, Project on the Status and Education of Women, Association of American Colleges). But see, *e. g.*, *id.*, at 49 (testimony of Darrell Royal, President, American Football Coaches

the legal basis for the Department's regulations, the Secretary noted:

"One of the places you look for guidance is in the interpretation that the courts have given to similar statutes. Title VI, in the *Finch* case, was interpreted in a way . . . that programs that have any educational value or any educational meaning are the ones that are covered regardless of whether the Federal funds go specifically to those programs.

"In other words, if the Federal funds go to an institution which has educational programs, then the institution is covered throughout its activities. That essentially was the ruling with respect to similar language in title VI, and that is why we used this interpretation in title IX." *Id.*, at 485.

Then, in a subsequent letter submitted to the Subcommittee, Secretary Weinberger addressed the precise issue posed by Grove City College in this case:

"[I]f students attending an institution of higher education are receiving benefits under the various Federal educational assistance programs, then *all* of the institution's activities that are supported by tuition payments of the students can be said to be receiving Federal financial assistance." *Id.*, at 488 (emphasis in original).[11]

---

Association); *id.*, at 98–99 (testimony of John A. Fuzak, President, National Collegiate Athletic Association); *id.*, at 231–232 (statement of Dallin H. Oaks, President, Brigham Young University); *id.*, at 403–406 (testimony of Janet L. Kuhn).

[11] The Secretary specifically cited and quoted from *Bob Jones University* v. *Johnson*, 396 F. Supp. 597 (SC 1974), affirmance order, 529 F. 2d 514 (CA4 1975), a decision interpreting the application of Title VI to a college that enrolled students receiving veterans' educational benefits. The court in *Bob Jones* offered several reasons to justify its finding that the college's educational program was receiving federal assistance:

"First, payments to veterans enrolled at approved schools serve to defray the costs of the educational program of the schools thereby releasing insti-

Despite the attention focused upon, and the strong defense offered in support of, the programmatic reach of the Department's regulations at these hearings, the House offered no formal resistance to the regulations. Indeed, among the several resolutions of disapproval introduced in the House, only one directly mentioned this aspect of the regulations, and this resolution was not acted upon either by committee or by the full House. H. R. Con. Res. 311, 94th Cong., 1st Sess. (1975) (disapproving regulations that "would apply to athletic programs and grants which neither receive nor benefit from Federal financial assistance"); see 121 Cong. Rec. 19209 (1975).

Although the failure of Congress to disapprove the Department's regulations is not itself determinative, it does "len[d] weight to the argument" that the regulations were consistent with congressional intent. *North Haven*, 456 U. S., at 534. Moreover, "the relatively insubstantial interest given the resolutions of disapproval that were introduced seems particularly significant since Congress has proceeded to amend [Title IX] when it has disagreed with [the Department's] in-

tutional funds which would, in the absence of federal assistance, be spent on the student. . . .

"[S]econd . . . the participation of veterans who—but for the availability of federal funds—would not enter the educational programs of the approved school, benefits the school by enlarging the pool of qualified applicants upon which it can draw for its educational program.

"Finally, . . . [g]rant programs frequently use institutions as conduits through which federal funds or other assistance pass to the ultimate beneficiaries. Clearly, Title VI attaches to a recipient acting in that capacity. . . . The altered method of payment under the current statutes [under which federal moneys go directly to the students] does not change the nature of the program or the basic role of the schools participating in the program. . . . [T]he nondiscriminatory participation of these schools is essential if the benefits of these statutes are to flow to beneficiaries without regard to race." 396 F. Supp., at 602–603 (footnotes omitted).

The court also explained that coverage of the college's educational program was fully consistent with the congressional purpose underlying Title VI. See *id.*, at 604.

terpretation of the statute." *Ibid.* Indeed, those amendments, by exempting from the reach of Title IX various facilities or services at educational institutions that themselves do not receive direct federal aid, strongly suggest that Congress understands the statute otherwise to encompass such programs or activities.[12]

[12] In 1974, after the Department had published its proposed regulations for Title IX, the Congress excepted social fraternities and sororities and voluntary youth service organizations from the statute's reach. Pub. L. 93–568, § 3(a), 88 Stat. 1862 (codified at 20 U. S. C. § 1681(a)(6)); see 120 Cong. Rec. 41390–41394 (1974). Later, in 1976, Congress provided statutory exemptions for activities related to Boys/Girls State/Nation conferences, father-son or mother-daughter activities (if reasonable opportunities exist for the opposite sex), and collegiate scholarships awarded to "beauty" pageant winners. Pub. L. 94–482, § 412(a), 90 Stat. 2234 (codified at 20 U. S. C. §§ 1681(a)(7–9)); see 122 Cong. Rec. 27979–27987 (1976). Obviously, since none of these activities receive direct federal support, these amendments would have been superfluous unless Title IX was otherwise to be applied to such activities when conducted by educational institutions receiving federal funds.

Other congressional developments since the issuance of the Department's regulations, which have not resulted in amendments to the statute, lend even more support to the broader view of Title IX. After the Department's final regulations went into effect in 1975, for example, Senator Helms introduced amendments to Title IX which would have defined "education programs and activities" to mean "only programs or activities which are an integral part of the required curriculum of an educational institution." S. 2146, § 2(1), 94th Cong., 1st Sess. (1975); see 121 Cong. Rec. 23845–23847 (1975). No action was taken on the bill. Similarly, in 1976, Senator McClure sponsored an amendment to define "education program or activity" as "such programs or activities as are curriculum or graduation requirements of the institutions." Amendment No. 389 to S. 2657, 94th Cong., 2d Sess. (1976); see 122 Cong. Rec. 28136 (1976). This amendment was rejected in a recorded vote. *Id.*, at 28147. Finally, the 98th Congress has recently reaffirmed its commitment to Title IX and to the regulations originally issued thereunder. In particular, the House passed (414–8) a resolution expressing its belief that Title IX and its regulations "should not be amended or altered in any manner which will lessen the comprehensive coverage of such statute in eliminating gender discrimination throughout the American educational system." H. Res. 190, 98th Cong., 1st Sess. (1983); 129 Cong. Rec. H10085–H10095, H10100–H10101 (Nov. 16, 1983). See H. R. Rep. No. 98–418 (1983). See also S. Res. 149,

In conclusion, each of the factors relevant to the interpretation of the program-specificity requirements of Title IX, taken individually or collectively, demonstrates that the Court today limits the reach of Title IX in a way that was wholly unintended by Congress. The contemporaneous legislative history of Title IX, the relevant interpretation of similar language in Title VI, and the administrative and legislative interpretations of Title IX since the statute's original enactment all lead to the same conclusion: that Title IX coverage for an institution of higher education is appropriate if federal moneys are received by or benefit the entire institution.

## II

A proper application of Title IX to the circumstances of this case demonstrates beyond peradventure that the Court has unjustifiably limited the statute's reach. Grove City College enrolls approximately 140 students who utilize Basic Educational Opportunity Grants (BEOG's) to pay for their education at the College. Although the grant moneys are paid directly to the students, the Court properly concludes that the use of these federal moneys at the College means that the College "receives Federal financial assistance" within the meaning of Title IX. The Court also correctly notes that a principal purpose underlying congressional enactment of the BEOG program is to provide funds that will benefit colleges and universities as a whole. It necessarily follows, in my view, that the entire undergraduate institution operated by Grove City College is subject to the antidiscrimination provisions included in Title IX.

## A

In determining the scope of Title IX coverage, the primary focus should be on the purposes meant to be served by the

---

98th Cong., 1st Sess. (1983). After today's Court decision, it will take another reaffirmation of congressional intent, in the form of a clarifying amendment to Title IX, to ensure that the original legislative will is no longer frustrated.

particular federal funds received by the institution.[13]    In this case, Congress has clearly indicated that BEOG moneys are intended to benefit any college or university that enrolls students receiving such grants.    As the Court repeatedly recognizes: "The legislative history of the [Education Amendments of 1972] is replete with statements evincing Congress' awareness that the student assistance programs established by the amendments would significantly aid colleges and universities.    In fact, one of the stated purposes of the student aid provisions was to 'provid[e] assistance to institutions of higher education.'  Pub. L. 92–318, § 1001(c)(1), 86 Stat. 381, 20 U. S. C. § 1070(a)(5)."  *Ante,* at 565–566 (footnote omitted).    See also *ante,* at 564 (Title IX "contains no hint that Congress perceived a substantive difference between direct institutional assistance and aid received by a school through its students"); *ante,* at 565, n. 13 ("student aid programs . . . were . . . designed to assist colleges and universities"); *ante,* at 569, n. 19 ("The history of [the reenactments of the statutory authorization for BEOG's] makes clear that Congress regards BEOG's and other forms of student aid as a critical source of support for educational institutions").

In many respects, therefore, Congress views financial aid to students, and in particular BEOG's, as the functional equivalent of general aid to institutions.    Given this undeniable and clearly stated congressional purpose, it would seem to be self-evident that Congress intended colleges or universities enrolling students who receive BEOG's to be covered, in their entirety, by the antidiscrimination provisions of Title IX.    That statute's primary purpose, after all, is to ensure

---

[13] Because I believe that BEOG moneys are intended by Congress to benefit institutions of higher education in their entirety, I find it unnecessary in this case to decide whether Title IX's reach would be the same when more targeted federal aid is being received by an institution.    For such cases, it may be appropriate to examine carefully not only the purposes but also the actual effects of the federal moneys received.

that federal moneys are not used to support discriminatory practices. *Cannon*, 441 U. S., at 704.

Under the Court's holding, in contrast, Grove City College is prohibited from discriminating on the basis of sex in its own "financial aid program," but is free to discriminate in other "programs or activities" operated by the institution. Underlying this result is the unstated and unsupportable assumption that moneys received through BEOG's are meant only to be utilized by the College's financial aid program. But it is undisputed that BEOG moneys, paid to the institution as tuition and fees and used in the general operating budget, are utilized to support most, and perhaps all, of the facilities and services that together constitute Grove City College.[14]

The absurdity of the Court's decision is further demonstrated by examining its practical effect. According to the Court, the "financial aid program" at Grove City College may not discriminate on the basis of sex because it is covered by Title IX, but the College is not prohibited from discriminating in its admissions, its athletic programs, or even its various academic departments. The Court thus sanctions practices that Congress clearly could not have intended: for example, after today's decision, Grove City College would be free to segregate male and female students in classes run by its mathematics department. This would be so even though

[14] Although JUSTICE STEVENS properly notes that there have been no findings of fact on this particular point, see *ante*, at 580–581 (concurring in part and concurring in result), even the Court is forced to concede the obvious, see *ante*, at 573 ("It is true, of course, that substantial portions of the BEOG's received by Grove City's students ultimately find their way into the College's general operating budget and are used to provide a variety of services to the students through whom the funds pass"). The Court nonetheless ignores its own concession by claiming that there is "no persuasive evidence" that Congress intended to cover an entire institution of higher education in this situation. As I explain in Part II, however, the evidence of congressional intent is quite persuasive, if not convincing.

the affected students are attending the College with the financial assistance provided by federal funds.   If anything about Title IX were ever certain, it is that discriminatory practices like the one just described were meant to be prohibited by the statute.

B

The Court, moreover, does not offer any defensible justification for its holding.   First, the Court states that it has "no doubt" that BEOG's administered through the Regular Disbursement System (RDS) are received, not by the entire College, but by its financial aid program.   Thus, the Court reasons, BEOG's administered through the Alternative Disbursement System must also be received only by the financial aid program.   The premise of this syllogism, however, simply begs the question presented; until today's decision, there was considerable doubt concerning the reach of Title IX in a college or university administering BEOG's through the RDS.   Indeed, the extent to which Title IX covers an educational institution receiving BEOG's is the same regardless of the procedural mechanism chosen by the college to disburse the student aid.   With this argument, therefore, the Court is simply restating the question presented by the case.

Second, the Court rejects the notion that the federal funds disbursed under the BEOG program are received by the entire institution because they effectively "free up" the College's own resources for use by all programs or activities that are operated by Grove City College.   But coverage of an entire institution that receives BEOG's through its students is not dependent upon such a theory.   Instead, Title IX coverage for the whole undergraduate institution at Grove City College is premised on the congressional intent that BEOG moneys would provide aid for the college or university as a whole.   Therefore, whatever merit the Court's argument may have for federal moneys that are intended solely to benefit a particular aspect of an educational institution, such as

a research grant designed to assist a specific laboratory or professor, see n. 13, *supra*, the freeing-up theory is simply irrelevant when the federal financial assistance is meant to benefit the entire institution.

Third, the Court contradicts its earlier recognition that BEOG's are no different from general aid to a college or university by claiming that "[s]tudent financial aid programs . . . are *sui generis.*" *Ante*, at 573. Although this assertion serves to limit severely the effect of the Court's holding, it is wholly unexplained, especially in light of the forceful evidence of congressional intent to the contrary. Indeed, it would be more accurate to say that financial aid for students is the prototypical method for funneling federal aid to institutions of higher education.

Finally, although not explicitly offered as a rationale, the Court's holding might be explained by its willingness to defer to the Government's position as it has been represented to this Court. But until the Government filed its briefs in this case, it had consistently argued that Title IX coverage for the entire undergraduate institution operated by Grove City College was authorized by the statute. See *ante*, at 562, n. 10, 570. The latest position adopted by the Government, irrespective of the motivations that might underlie this recent change, is therefore entitled to little, if any, deference. Cf. *North Haven*, 456 U. S., at 522–523, n. 12, 538–539, n. 29 (deference not appropriate when "there is no consistent administrative interpretation of the Title IX regulations"). The interpretation of statutes as important as Title IX should not be subjected so easily to shifts in policy by the executive branch.

### III

In sum, the program-specific language in Title IX was designed to ensure that the reach of the statute is dependent upon the scope of federal financial assistance provided to an institution. When that financial assistance is clearly

intended to serve as federal aid for the entire institution, the institution as a whole should be covered by the statute's prohibition on sex discrimination. Any other interpretation clearly disregards the intent of Congress and severely weakens the antidiscrimination provisions included in Title IX. I therefore cannot join in Part III of the Court's opinion.