The ASSOCIATION OF MEXICAN–AMERICAN EDUCATORS ("AMAE"); the California Association for Asian–Pacific Bilingual Education ("CAFABE"); the Oakland Alliance of Black Educators ("OABE") on behalf of themselves, their members, and all others similarly situated; Sara MacNeil Boyd; Florence Flores; Sam Genis; Viry Kem; Toua Yang; Robert Williams; Frank Rivera; Ricardo Peinado; Marta LeClaire; Antoinette Williams; Diana Kwan; Jaime Lara; Joyce Santiago; Maribel Diaz and Agnes Haynes, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

The STATE OF CALIFORNIA and The California Commission on Teacher Credentialing, Defendants.

No. C–92–3874 WHO.

United States District Court, N.D. California.

Aug. 25, 1993.

John T. Affeldt, Louis Salisbury, Armando M. Menocal, III, Public Advocates, Inc., San Francisco, CA, for plaintiffs.

Stephanie Wald, Daniel E. Lungren, CA State Atty. Gen. Office, San Francisco, CA, Nancy E. Ryan, Charles A. Shanor, R. Lawrence Ashe, Paul, Hastings, Janofsky & Walker, Atlanta, GA, for defendants.

## OPINION AND ORDER

ORRICK, District Judge.

Plaintiffs, three associations and fifteen individuals, brought this ·class action lawsuit,[1] challenging defendants' use of the California Basic Educational Skills Test ("CBEST") as a requirement for certification to teach in the California public schools. Cal.Educ.Code §§ 44252(b), 44830(b) (West Supp.1993). Defendants are the State of California ("State") and the California Commission on Teacher Credentialing ("CTC"). Plaintiffs contend that the CBEST requirement violates Title VI of the Civil Rights Act of 1964, Pub.L. No. 88–352, 78 Stat. 252 (codified as amended at 42 U.S.C. §§ 2000d–2000d–4 (West Supp. 1993)), and Title VII of the same Act, 78 Stat. 253 (codified as amended at 42 U.S.C. §§ 2000e–2000e–17).[2]

Both sides have filed cross-motions for partial summary judgment with respect to the applicability of these two statutes to this case. For the reasons hereinafter stated, the Court grants plaintiffs' motion and denies defendants' motion.

1. The Court has not yet certified this case under Rule 23 of the Federal Rules of Civil Procedure.

2. Plaintiffs also state a claim for attorneys' fees under 42 U.S.C. § 1988.

## I.

The relevant facts are not in dispute. A brief overview of the way that California's public schools receive their funds, the history of teacher credentialing in the State, and the development and implementation of the CBEST is in order.

### A. Public School Financing in California.

The United States has long provided the State, through its Board of Education ("Board"), financial assistance for use in education; it is undisputed that the Board has received this federal financial assistance continuously since 1983. During that same time period, the California Department of Education ("DOE") has distributed most of that federal money to local school boards, which also have received financial assistance directly from the federal government. The federal assistance has been substantial: from 1983 through 1991, the federal government contributed more than $10 billion toward public education in California. The Board has passed on to the local school districts the bulk of the money received.

From the 1983–84 fiscal year through the 1990–91 fiscal year, State aid to K–12 public education accounted for approximately sixty-six percent of the total amount spent on K–12 public education in California. During the same time period, the average annual total of State aid to K–12 public education was approximately $12.9 billion; the total annual amount spent on K–12 public education (including money received from local governments) averaged about $19.5 billion. Approximately sixty-five of the State's 1,056 school districts receive more money from local government than they receive from the State.

Employee salaries and benefits account for the lion's share of the average school district's expenditures. More than eighty percent of the average district's expenditures go toward all employees' salaries and benefits; about fifty percent of the average district's expenditures go toward the payment of salaries for certificated personnel.[3]

3. Other district operating expenditures include books and other supplies, equipment, utilities, housekeeping services, sites, and site improvements.

B. *Teacher Credentialing in California.*

On January 1, 1964, the California Legislature created the Teachers Professional Standards Commission ("TPSC"), which was made up of thirteen members that the Board appointed, and whose chair was the California Superintendent of Public Instruction ("Superintendent"). The TPSC served in an advisory capacity to the Board, making recommendations on standards and policies for developing and maintaining a system of licensing certificated personnel for services in the State's public schools. Also on January 1, 1964, the State Legislature established a Committee of Credentials ("COC") within the DOE. The COC was made up of the Superintendent and his four appointees, and was responsible for granting, issuing, suspending, and revoking credentials and life diplomas. An applicant denied a credential could take an appeal to the Board, which had the authority to issue the credential or to deny the application.

The statutory authority for the TPSC and the COC was repealed effective January 1, 1971. In its place, the Legislature created the Commission for Teacher Preparation and Licensing ("CTPL"). The CTPL's members included fifteen voting members, appointed by the Governor, and five *ex officio,* nonvoting members, one of whom was the Superintendent (or his designee). The COC continued to exist, but was placed under the direct authority of the CTPL, which appointed the COC's members. The CTPL was authorized to develop the standards and procedures for certifying educational personnel. The ultimate authority for certifying personnel, however, remained in the Board, which had review and approval power over all the CTPL's rules, regulations, and determinations. The costs of the CTPL's activities were offset entirely by the fees levied for the issuance of credentials.

On January 1, 1983, the CTPL's name was changed to the CTC. Effective January 1, 1989, the Legislature repealed the requirement that the Board review and approve the CTC's licensing rules, regulations, and determinations. In place of that mandate, the Legislature required the CTC, the Board, and the Superintendent to notify one another regarding any proposed policies and regulations. The notification requirement exists to ensure consistency in State policies concerning teacher preparation, curriculum, and instruction in California's public schools. Pursuant to the most recent legislative changes, the CTC's membership must include the Superintendent (or her or his designee) as a voting member. Cal.Educ.Code § 44210(a).

Since January 1, 1980, the CTC (and its predecessor, the CTPL) have received no financial assistance from the federal government; indeed, during the entire history of the credentialing authority (whether the CTPL or CTC), that entity has received federal financial assistance for only one project: a teaching effectiveness research project, referred to as The Beginning Teacher Evaluation Study ("BTES"). The federal government stopped providing aid for the BTES in 1979.[4]

C. *The CBEST.*

Effective February 1, 1983, the State Legislature amended the Education Code to bar the CTPL from issuing any credential, permit, or certificate to any applicant unable to demonstrate basic reading, writing and mathematics skills in the English language, as measured by a basic skills proficiency test. *Id.* § 44252(b). A local school district may not "initially hire on a permanent, temporary, or substitute basis a certificated person seeking employment" unless that person has passed the basic skills proficiency test. *Id.* § 44830(b).[5]

The CTPL was given responsibility for administering the test (a responsibility sub-

---

4. The parties have been unable to verify either the date on which the federal assistance started or the total amount of federal dollars provided for the BTES.

5. The Legislature provided exemptions from the testing requirement for certain classes of individuals. *See* Cal.Educ.Code §§ 44252(b)(1)–(6),

44830(c)–(n). For example, a school district may hire a credentialed individual who is employed in another district, but who hasn't passed the basic skills proficiency test, provided that individual was employed by the other district for the thirty-nine-month period preceding his or her employment with the hiring district. *Id.* § 44830(c).

sequently passed on to the CTC); the Superintendent, along with the assistance of the CTPL and a select Advisory Board, was charged with devising the test. The Advisory Board had thirty-one members, seventeen of whom were classroom teachers; the other fourteen members included school administrators, parents of public school students, and representatives from school district governing boards and from post-secondary institutions. The Superintendent selected all the Advisory Board's members; the DOE and the CTPL each provided a staff member to assist the Advisory Board, whose primary responsibility was to recommend the nature and the level of the basic skills to be tested.

The CTPL and the Office of Program Evaluation and Research ("OPER"), a division of the DOE, each released a request for proposals, inviting outside contractors to assist in the test's development. OPER selected and contracted with Educational Testing Services ("ETS") to assist with developing the test, conduct field tests, and perform a validity study. ETS began developing the CBEST in July 1982. The first CBEST was administered on December 18, 1982.

In May 1983, after three test administrations, the CTC assumed full responsibility for revising and administering the CBEST. To date, the CTC has not changed the passing scores from those established at the time of the first CBEST administration.

The CTC does not obtain certificated employees for local school districts or obtain jobs for certificated employees. Employees who wish to transfer from one school district to another must do so on their own. The CTC does not require its own staff members to pass the CBEST or to hold a credential.

## II.

Cross-motions for partial summary judgment are before the Court with respect to two issues, namely, (1) whether Title VI applies in this case, and (2) whether Title VII applies in this case. After reviewing the standards that govern summary judgment motions, the Court considers the applicability of each statute in turn.

### A.

Rule 56 of the Federal Rules of Civil Procedure provides that a court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

The Supreme Court's 1986 "trilogy" of *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), requires that a party seeking summary judgment identify evidence that shows the absence of a genuine issue of material fact. Once the moving party has made this showing, the nonmoving party must " 'designate specific facts showing that there is a genuine issue for trial.' " *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553 (quoting Fed.R.Civ.P. 56(e)). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1355. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249–50, 106 S.Ct. at 2510–11 (citations omitted).

### B.

Plaintiffs' second cause of action charges violations of Title VI. They contend that the CBEST, as used and administered by defendants, has a disparate impact on racial minorities, thereby excluding them from participation in the market for certificated positions in public education. Plaintiffs also contend that the CBEST is not justified by any educational necessity, and that less discriminatory measures exist by which defendants can measure plaintiffs' skills in reading, writing, and mathematics.

Defendants argue that plaintiffs may not maintain an action based upon Title VI because: (1) neither defendant is covered by

Title VI; (2) a claim based on disparate impact, as opposed to intentional discrimination, cannot be brought under Title VI; (3) even if the administrative regulations implementing Title VI prohibit activities having a disparate impact, those regulations do not create a private right of action; and (4) at least some of the plaintiffs' claims are barred by the applicable statute of limitations. These arguments are considered in turn.

1.

Title VI contains a broad prohibition on the use of federal dollars to subsidize racial discrimination:

> No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under *any program or activity receiving Federal financial assistance.*

42 U.S.C. § 2000d (emphasis added). Congress passed Title VI "to accomplish two related, but nevertheless somewhat different, objectives. First, Congress wanted to avoid the use of federal resources to support discriminatory practices; second, it wanted to provide individual citizens effective protection against those practices." *Cannon v. University of Chicago,* 441 U.S. 677, 704, 99 S.Ct. 1946, 1961, 60 L.Ed.2d 560 (1979) (discussing Title IX of the Education Amendments of 1972, Pub.L. No. 92–318, § 901(a), 86 Stat. 373 (codified as amended at 20 U.S.C. § 1681(a)), which, as the Court noted, 441 U.S. at 694, "was patterned after Title VI").

In 1984, the Supreme Court, in a case involving Title IX, construed "program or activity" to mean only those entities that actually received federal funds. *Grove City College v. Bell,* 465 U.S. 555, 570–74, 104 S.Ct. 1211, 1219–21, 79 L.Ed.2d 516 (1984). Three years later, Congress overturned *Grove City* by passing the Civil Rights Restoration Act of 1987 ("Restoration Act"), Pub.L. No. 100–259, 102 Stat. 28. The Restoration Act amended Title VI by adding an expansive definition of the term "program or activity." 42 U.S.C. § 2000d–4a. Defendants argue that the broad language of the Restoration Act notwithstanding, neither of

them is covered by Title VI. Defendants contend that the State is exempt from liability under Title VI because the statute covers only the State's "programs or activities," not the State itself. With respect to the CTC, defendants argue that Title VI does not apply because the CTC receives no "federal financial assistance." The arguments with respect to each defendant are considered in turn.

(a) *The State.*

Defendants argue that the State is neither a "program" nor an "activity," because those terms plainly refer to *sub-divisions* of state government. Plaintiffs concede that the State is not a "program or activity," as that term is defined in § 2000d–4a, but contend that it nevertheless is covered by Title VI because the State *implements* the discrimination caused by one of its "programs or activities," specifically the CTC. Plaintiffs point out that the Supreme Court has said liability under Title VI is coextensive with liability under the Equal Protection Clause of the Fourteenth Amendment. *Regents of the Univ. of Cal. v. Bakke,* 438 U.S. 265, 287, 98 S.Ct. 2733, 2746, 57 L.Ed.2d 750 (1978) (opinion of Powell, J.); *id.* at 328, 98 S.Ct. at 2767 (opinion of Brennan, White, Marshall, and Blackmun, JJ.). States clearly are liable for Equal Protection violations, and plaintiffs claim it would be "anomalous" for states not to be liable under Title VI as well.

■ Defendants correctly argue that plaintiffs' reliance on *Bakke* is misplaced, for that case says only that the *type* of discrimination outlawed by the Equal Protection Clause (discriminatory animus) is the same type of discrimination outlawed by Title VI. The issue here is not the type of discrimination Title VI prohibits (that issue is considered in Section 2, *infra*), but rather which *entities* may be liable for Title VI violations. The Equal Protection Clause and Title VI have some rather pronounced differences in terms of the entities that may be liable for violations of each. The Equal Protection Clause generally bars racial discrimination only by state actors; Title VI, in contrast, applies to private, as well as to public, enti-

ties. 42 U.S.C. § 2000d–4a(3). *Bakke,* therefore, is not on point.

More compelling is plaintiffs' argument that language in Title VI itself permits their suit against the State. As part of the Rehabilitation Act Amendments of 1986, Pub.L. No. 99–506, 100 Stat. 1845, Congress added the following provision to Title VI: "A *State* shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of . . . title VI of the Civil Rights Act of 1964. . . ." 42 U.S.C. § 2000d–7(a)(1) (emphasis added). This statute has received scant attention in the case law.

Only one. other district court has considered § 2000d–7 in the context of an argument similar to that made by defendants in this case. In a case involving a Title VI challenge to an allegedly segregated school system, that court rejected the State of Indiana's motion for summary judgment. *Parents for Quality Educ. with Integration, Inc. v. Indiana,* 753 F.Supp. 733, 736–37 (N.D.Ind.1990), *aff'd,* 977 F.2d 1207 (7th Cir. 1992), *modified,* 986 F.2d 206 (7th Cir.1993). The case is of limited value here, however, because the district court did not include in its discussion whether the State was claiming exemption from Title VI on the ground that it was not a "program or activity." An earlier decision in the same case, holding that "[t]he express language [of § 2000d–7] clearly illustrates that a State or its agencies may be sued in federal court under [Title VI,]" likewise is of little assistance, given that the quoted statement appears in the context of a general discussion of Eleventh Amendment immunity. *Parents for Quality Educ. with Integration, Inc. v. Indiana,* 662 F.Supp. 1475, 1481 (N.D.Ind.1987).

The two opinions are significant, however, because they are part of a long line of cases in which a state was a Title VI defendant even though it was not a "program or activity." *See, e.g., United States v. Yonkers Bd. of Educ.,* 893 F.2d 498, 500 (2d Cir.1990) (State of New York as Title VI defendant); *Georgia State Conference of Branches of NAACP v. Georgia,* 775 F.2d 1403, 1407 (11th Cir.1985); *Queets Band of Indians v. Washington,* 765 F.2d 1399, 1404 n. 2 (9th

Cir.1985), *vacated as moot,* 783 F.2d 154 (9th Cir.1986); *United States v. School Dist. of Ferndale,* 577 F.2d 1339, 1350 n. 18 (6th Cir.1978) (State of Michigan as Title VI defendant); *Knight v. Alabama,* 787 F.Supp. 1030, 1361–65 (N.D.Ala.1991); *United States v. Louisiana,* 692 F.Supp. 642, 650–53 (E.D.La.1988).

The consistent understanding, as reflected by cases such as these, is that a state may be sued under Title VI, at least where the state is the entity responsible for the Title VI violation. Defendants attempt to distinguish these cases in two ways. First, they argue that the cases decided *before* passage of the Restoration Act are not on point because that Act made clear that a state is not a "program or activity." Second, defendants argue that none of the cases decided *after* Congress passed the Restoration Act expressly dealt with the argument defendants advance here. Taking the latter argument first, defendants are correct that the mere fact that other courts have permitted Title VI actions against states, without considering the argument that a state is not a "program or activity," does not foreclose defendants from raising the argument in this case. *See Brecht v. Abrahamson,* —— U.S. ——, ——, 113 S.Ct. 1710, 1718, 123 L.Ed.2d 353 (1993). When their argument is considered on the merits, however, it becomes clear that it is without merit.

The common element to both of defendants' arguments for distinguishing the cited cases is that among the changes wrought by the Restoration Act was the exemption of the states themselves (as opposed to their "programs or entities") as defendants. Defendants purport to find support for that argument in two sources: (1) the language and structure of § 2000d–4a, and (2) the Restoration Act's legislative history.

The first of these sources, the language and structure of the statutory text, is preferred for purposes of divining congressional intent. *See, e.g., United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989) ("[W]here . . . the statute's language is plain, 'the sole function of the courts is to enforce it

according to its terms.' ") (quoting *Caminetti v. United States,* 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917)). The problem for defendants is that the statutory language doesn't clearly support their argument. Although the text of § 2000d–4a, which is set out in detail at page 1543, *infra,* obviously excludes a state from the definition of "program or activity" (a conclusion that plaintiffs do not dispute), *nothing* in the language of Title VI mandates that an entity must be a "program or activity" to be a Title VI defendant. Indeed, to the extent it has any bearing on this issue, the statutory language points in the *opposite* direction. Section 2000d–7 quite clearly provides that a state *may* be a defendant in a Title VI action.[6]

Defendants are left only with their reliance on the Restoration Act's legislative history. They seize on the following statement in the Senate Committee Report that accompanied the Act to the Senate floor: "For State and local governments, *only the department or agency which receives the aid is covered.*" S.Rep. No. 64, 100th Cong., 2d Sess. 4 (1987), *reprinted in* 1988 U.S.C.C.A.N. 3, 6 (emphasis added). According to defendants, the upshot of this statement is that the Restoration Act did not expose the State itself to the prospect of losing federal funds in the event one of its subdivisions was in violation of Title VI.

This single sentence in the legislative history is not compelling evidence that Congress, by passing the Restoration Act, intended either to abolish the accepted practice

of states being sued as defendants, *see* cases cited at page 1541, *supra,* or to override the plain language of § 2000d–7 (which was on the books *before* the Restoration Act was passed). To make matters worse for defendants, this brief snippet from the Committee Report is surrounded by statements that could support a conclusion that goes against defendants' position. The sentence immediately following the one cited by defendants reads as follows: "Where an entity of state or local government receives federal aid and distributes it to another department or agency, both entities are covered." S.Rep. No. 64, *supra,* at 4, *reprinted in* 1988 U.S.C.C.A.N. at 6. This sentence certainly could bear the construction that where a state itself receives federal money (as does the State of California) and then distributes that money to one of its agencies (e.g., a local school district), "both entities are covered." Of course, the sentence just as easily could be construed to support defendants' position, *viz.,* only "an entity *of* state or local government," and not the state or local government, is "covered."

But the Court is not construing the Committee Report, it is construing the statute. That the statute's legislative history contains sentences that can be stretched to support the positions of either side in this lawsuit only makes the case more compelling for the Court to focus on the words in Title VI. *Cf. Conroy v. Aniskoff,* —— U.S. ——, ——, 113 S.Ct. 1562, 1567, 123 L.Ed.2d 229 (1993) (Scalia, J., concurring in the judgment) (re-

---

**6.** The clear statement in § 2000d–7 also disposes of defendants' reliance on *Gregory v. Ashcroft,* —— U.S. ——, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991). The plaintiffs in *Gregory* were Missouri judges subject to that state's constitutional requirement that virtually all state judges retire at age seventy. The plaintiffs challenged that provision under the Age Discrimination in Employment Act of 1967 ("ADEA"), Pub.L. No. 90–202, 81 Stat. 602 (codified as amended at 29 U.S.C. §§ 621–634), which makes it unlawful for an employer to discharge any individual over the age of forty on account of that person's age. 29 U.S.C. §§ 623(a), 631(a). The ADEA exempts from its coverage certain high-ranking government officials, including, *inter alios,* "an appointee on the policymaking level." *Id.* § 630(f).

The Court determined that the ADEA's text was "at least ambiguous" on the question "whether a

state judge is an 'appointee on the policymaking level.' " —— U.S. at ——, 111 S.Ct. at 2404. Because the state decision in issue, the qualification for those who would serve as its judges, was "a decision of the most fundamental sort for a sovereign entity[,]" *id.* at ——, 111 S.Ct. at 2400, the Court held that it would not, in the absence of a plain statement to the contrary, find that Congress did not mean for state judges to fit within the exemption of § 630(f). *Id.* at —— ——, 111 S.Ct. at 2405–06.

In this case, the Court may assume that the State's control of its education system is a function "of the most fundamental sort for a sovereign entity." *Id.* at ——, 111 S.Ct. at 2400. The *Gregory* plain statement requirement is satisfied, however, by § 2000d–7, which clearly and unambiguously provides that a state may be sued for a Title VI violation.

calling Judge Leventhal's description of "the use of legislative history as the equivalent of entering a crowded cocktail party and looking over the heads of the guests for one's friends").

There is nothing in the language of Title VI, including the Restoration Act, to indicate that an entity must be a "program or activity" if it is to be sued for a violation of Title VI. Indeed, the accepted practice, both before and after the Restoration Act's passage, has been that a state may be sued so long as it is responsible for the Title VI violation. In this case, the undisputed facts show that the State is responsible for creating the CTC and for requiring passage of the CBEST as a prerequisite to certificated employment in the California public schools. The facts as they develop in the future may or may not support a finding that the State's actions violate Title VI. The State may not escape Title VI liability, however, simply because it is not a "program or activity."

### (b) The CTC.

With respect to the CTC, defendants argue that Title VI does not apply because it is undisputed that neither the CTC nor its predecessor, the CTPL, received any federal financial assistance during the relevant time period. Defendants cite *Baker v. Board of Regents*, 991 F.2d 628, 631 (10th Cir.1993), for the proposition that in Title VI cases, "the entity engaging in discrimination [must be] receiving federal financial assistance." While the *Baker* court listed this as an element of a Title VI *claim*, it did so only in the course of discussing the relevant statute of limitations for such a cause of action. More importantly, the Tenth Circuit did *not* hold that the *defendant* must be the entity that receives the federal funds. Nor could it have so held, because a requirement of that kind would represent a return to *Grove City*'s "program-specific" limitation on the statute's coverage. *See* 465 U.S. at 563–74, 104 S.Ct. at 1216–21.

As discussed above, that limitation was specifically rejected by the Restoration Act, which substituted in its place a broad defini-

tion for the term "program or activity." The relevant sections of the Restoration Act provide as follows:

> For the purposes of this subchapter, the term "program or activity" and the term "program" mean *all the operations of*—
>
> (1)(A) a department, agency, special purpose district, or other instrumentality of a State or of a local government; or
>
> (B) the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government;
>
> (2)(A) a college, university, or other postsecondary institution, or a public system of higher education; or
>
> (B) a local educational agency ..., system of vocational education, *or other school system;*
>
> ....
>
> (4) *any other entity which is established by two or more of the entities described in paragraph (1), (2), or (3).*[7]
>
> any part of which is extended Federal financial assistance.

42 U.S.C. § 2000d–4a (emphasis added). Defendants' argument is predicated upon limiting "program or activity" based upon the words that follow that term in § 2000d: "receiving Federal financial assistance." Such a limitation, however, would render § 2000d–4 superfluous, a result the Court must strive to avoid. *United States v. Menasche*, 348 U.S. 528, 538–39, 75 S.Ct. 513, 519–20, 99 L.Ed. 615 (1955); *Bresgal v. Brock*, 843 F.2d 1163, 1166 (9th Cir.1987).

■ Section 2000d–4a provides that a "program or activity" (or just a "program") includes "*all* the operations of" any one of a number of entities, subject only to the proviso that at least one (or, as the statute provides, "any") "part of" that entity's operations "is extended Federal financial assis-

---

7. The parties agree that subsection (3), which deals with private organizations that receive fed-

eral dollars, is not implicated by this case.

tance." Thus, in the case of a public "college" (to use subsection (2)(A) as an example), so long as *"any part"* of that college's "operations" receive "federal financial assistance," *"all"* of that college's "operations" are "programs or activities" and are subject to Title VI.

Under defendants' suggested reading of the statute, only the specific "parts" of the college's operations that receive federal dollars (e.g., its student financial aid office) would be covered by the term "program or activity." This could hardly be considered an unreasonable way of reading § 2000d, unaided by any other statutory provision; indeed, a majority of the Supreme Court subscribed to such a reading in *Grove City. See* 465 U.S. at 569–70, 104 S.Ct. at 1219. But defendants' suggested reading is positively untenable in light of the plain language of § 2000d–4a.

■ The only remaining question, therefore, is whether the CTC is a "part" of "the operations" of one of the entities listed in § 2000d–4a. That question clearly must be answered in the affirmative, because the CTC is part of a "school system," referred to in subsection (2)(B). Specifically, the CTC is part of the California public school system, which "is extended" a large sum of "federal financial assistance" on an annual basis.

The Ninth Circuit has said that "through the state constitution, statutes, and supreme court decisions, California has made public schooling a *state governmental function." Belanger v. Madera Unified School District,* 963 F.2d 248, 253 (9th Cir.1992) (emphasis added), *cert. denied,* —— U.S. ——, 113 S.Ct. 1280, 122 L.Ed.2d 674 (1993). Of particular relevance to the instant controversy is the following provision from the California Constitution:

> The Public School System shall include all kindergarten schools, elementary schools, secondary schools, technical schools, and State colleges, established in accordance with law, and, in addition, the school districts *and the other agencies authorized to maintain them.* No school or college or any other part of the Public School System shall be, directly or indirectly, transferred from the Public School System or placed under the jurisdiction of any authority other than one included within the Public School System.

Cal. Const. art. IX, § 6, ¶ 2 (emphasis added). Defendants insist that the phrase, "the other agencies authorized to maintain them," refers only to those entities that *local* governments establish to support their school districts, such as the local school boards and local school superintendents.

The California courts, however, have rejected such a crabbed interpretation of this constitutional provision, holding instead that the "public school system" is the *entire,* unified school system that the constitution requires the State Legislature to provide. *See Kennedy v. Miller,* 97 Cal. 429, 432, 32 P. 558, 559 (1893); *California Teachers Ass'n v. Board of Trustees,* 82 Cal.App.3d 249, 253–54, 146 Cal.Rptr. 850, 853 (Cal.Ct.App.1978). The absurdity of defendants' position becomes clear when one considers the entities (apart from the CTC) that would be excluded from the "public school system" under defendants' proffered construction. Among these would be the Board, the DOE, and the Superintendent, because none is established by a local government to maintain a local school district. Such a result would be inconsistent with the cited California authorities. Defendants' suggested reading of the phrase, "the other agencies authorized to maintain them," is, accordingly, rejected.

Defendants' fallback position is that even if "the other agencies authorized to maintain them" includes State administrative agencies, the term surely does not cover the CTC. This is so, defendants argue, because the CTC is merely a licensing agency, and has nothing whatsoever to do with the actual hiring of a particular candidate for employment. As discussed in connection with the Title VII motions, Section B, *infra,* defendants' characterization of the CBEST as a licensing examination is specious. Defendants' argument that the CTC plays no part in the decision whether someone should be hired overlooks the fact that the entities that make the hiring decision, the local school districts, are barred from hiring someone who has not passed the CBEST. Cal.Educ. Code § 44830(b).

Because the CTC is the entity responsible for administering that test and for certifying that an individual has passed it, *id.* § 44252(b), the CTC may quite properly be considered an agency "authorized to maintain" the local districts. That being the case, the CTC is part of the State's "public school system," *many* "parts" of whose "operations" are "extended federal financial assistance." 42 U.S.C. § 2000d–4a. Accordingly, the CTC is a proper defendant to plaintiffs' Title VI cause of action.[8]

2.

■ Plaintiffs' Title VI claim does not allege that defendants intentionally use the CBEST to exclude racial minorities from the State's teaching force. Rather, plaintiffs allege that racial minorities fail the CBEST at a rate higher than that at which white applicants fail the test, that the CBEST is not justified by any educational necessity, and that alternative, less discriminatory measures exist by which the State may test the basic skills of its teaching applicants. (*See* First Am.Comp., filed Nov. 16, 1992, ¶¶ 263–65.) In other words, plaintiffs state a "disparate impact" claim under Title VI.

Disparate impact claims have long been allowed under Title VII. *See Griggs v. Duke Power Co.,* 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971) (Title VII "proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation"). Title VI disparate impact claims, however, have neither as long nor as clear-cut a pedigree as similar claims under Title VII. The issue is made all the more thorny by the fact that even though Title VI itself is silent on the question of disparate impact, the federal regulations promulgated pursuant to Title VI, 42 U.S.C. § 2000d–1, *do* prohibit the use of federal funds for programs that are discriminatory in effect, though not in purpose. *See, e.g.,* 15 C.F.R. § 8.4(b)(2) (1993) (Department of Commerce); 24 C.F.R. § 1.4(b)(2)(i) (1992)

(Department of Housing and Urban Development); 28 C.F.R. § 42.104(b)(2) (1992) (Department of Justice); 29 C.F.R. § 31.3(b)(2) (1992) (Department of Labor); 34 C.F.R. § 100.3(b)(2) (1992) (Department of Education).

The starting point for analysis of this issue is with the Supreme Court's decision in *Lau v. Nichols,* 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974). There, the Court held that Title VI itself forbade the use of federal funds in programs with a discriminatory effect, regardless of the purpose behind the program. *Id.* at 566–69, 94 S.Ct. at 788–89. Four years later, however, in *Bakke,* five Justices concluded that Title VI's prohibitions against racial discrimination were coextensive with those of the Fourteenth Amendment. 438 U.S. at 287, 98 S.Ct. at 2746 (opinion of Powell, J.); *id.* at 328, 98 S.Ct. at 2767 (opinion of Brennan, White, Marshall, and Blackmun, JJ.); *see also United States v. Fordice,* —— U.S. ——, —— n. 7, 112 S.Ct. 2727, 2738 n. 7, 120 L.Ed.2d 575 (1992). The view expressed by a majority of the Court in *Bakke* is significant because the Equal Protection Clause forbids only intentional discrimination. *Washington v. Davis,* 426 U.S. 229, 238–48, 96 S.Ct. 2040, 2046–51, 48 L.Ed.2d 597 (1976).

Five years after *Bakke,* a majority of the Court concluded that discriminatory animus *was* an essential element of a claim based on Title VI alone, and that *Lau*'s contrary holding had not survived *Bakke. Guardians Ass'n v. Civil Serv. Comm'n,* 463 U.S. 582, 610–12, 103 S.Ct. 3221, 3236–37, 77 L.Ed.2d 866 (1983) (Powell, J., concurring in the judgment); *id.* at 612, 103 S.Ct. at 3237 (O'Connor, J., concurring in the judgment); *id.* at 639–42, 103 S.Ct. at 3252–53 (Stevens, J., dissenting).[9] That did not end matters, however, because the Court in *Guardians* also considered the effect of the administrative regulations promulgated under Title VI.

---

8. The Court, therefore, need not consider plaintiffs' alternative argument, that the CTC is covered by subsection (4) of § 2000d–4a.

9. Justice Powell was joined in this conclusion by the Chief Justice and then-Justice Rehnquist; Justice Stevens was joined by Justice Brennan and Justice Blackmun. Only Justice White and

Justice Marshall adhered to *Lau*'s holding that discriminatory animus is not an essential element of a Title VI claim. *Guardians,* 463 U.S. at 589–90, 103 S.Ct. at 3225–26 (opinion of White, J.); *id.* at 623, 103 S.Ct. at 3243 (Marshall, J., dissenting).

A majority of the Court concluded (1) that the regulations were valid, and (2) that a disparate impact claim for declaratory and limited injunctive relief would lie under those regulations. *Id.* at 591–93, 103 S.Ct. at 3226–27 (opinion of White, J.); *id.* at 617–23, 103 S.Ct. at 3240–43 (Marshall, J., dissenting); *id.* at 642–45, 103 S.Ct. at 3253–55 (Stevens, J., dissenting).[10]

Defendants argue that *Guardians* does not control this case because the validity of the regulations was not then before the Supreme Court. Defendants' argument borders on the frivolous because all five Justices who concluded that a disparate impact claim for declaratory and injunctive relief was viable under the regulations *also concluded that the regulations were valid.* This is clear from the first page of Justice White's opinion, summarizing the Justices' positions on these issues:

> JUSTICE STEVENS, joined by JUSTICE BRENNAN and JUSTICE BLACKMUN, reasons that, although Title VI itself requires proof of discriminatory intent, *the administrative regulations incorporating a disparate-impact standard are valid.* JUSTICE MARSHALL would hold that, under Title VI itself, proof of disparate-impact discrimination is all that is necessary. I agree with JUSTICE MARSHALL that discriminatory animus is not an essential element of a violation of Title VI. *I also believe that the regulations are valid, even assuming, arguendo, that Title VI, in and of itself, does not proscribe disparate-impact discrimination.*

*Id.* at 584 n. 2, 103 S.Ct. at 3223 n. 2 (opinion of White, J.) (emphasis added) (citations omitted). Defendants' argument is all the more specious in light of the Supreme Court's own *unanimous* interpretation of *Guardians:* "the Court held that actions having an unjustifiable disparate impact on minorities could be redressed through agency regulations designed to implement the purposes of Title VI." *Alexander v. Choate,* 469 U.S. 287, 293, 105 S.Ct. 712, 716, 83 L.Ed.2d 661 (1985).

Defendants devote almost six pages of their opening brief to an elaborate argument that the regulations are invalid under traditional canons of administrative law. They describe the holding in *Guardians* as one effected by "a bare majority of the Court," as though that should make a difference to this Court's analysis of the present issue. This Court is unfamiliar with the suggested rule that a holding subscribed to by five Members of the Supreme Court is somehow entitled to less weight than a holding joined by six or more Justices. This Court is mindful, however, of the following admonition from the Supreme Court: "If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the [lower federal courts] should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/Am. Express, Inc.,* 490 U.S. 477, 484, 109 S.Ct. 1917, 1921, 104 L.Ed.2d 526 (1989).

Defendants' argument that the regulations implementing Title VI are invalid, insofar as they permit a disparate impact claim, is without merit and must be rejected.

### 3.

Defendants next argue that, even if the regulations implementing Title VI incorporate a disparate impact standard, plaintiffs may not enforce those regulations vis-a-vis a

---

**10.** Four members of the Court rejected the view that the agencies could promulgate regulations whose sweep was broader than that of the statute. *Id.* at 611 n. 5, 103 S.Ct. at 3237 n. 5 (Powell, J., concurring in the judgment); *id.* at 612–15, 103 S.Ct. at 3237–39 (O'Connor, J., concurring in the judgment). The alignment of the Justices on the question of the regulations was confusing because four of those in the majority on that question (Justice Brennan, Justice Marshall, Justice Blackmun, and Justice Stevens) dissented from the Court's judgment in the case.

Those four Justices agreed with Justice White that the regulations were valid and that the regulations authorized disparate impact claims for declaratory and injunctive relief; but they disagreed with Justice White's conclusion that discriminatory animus was an essential element of a Title VI claim for *compensatory* relief. With respect to the latter conclusion, the other four Justices (the Chief Justice, Justice Powell, then-Justice Rehnquist, and Justice O'Connor) were in agreement with Justice White.

private lawsuit.[11] The crux of defendants' argument is that the regulations apply only to the departments and agencies that promulgated them. According to defendants, the Department of Education (to take but one example) has said in 34 C.F.R. § 100.-3(b)(2) that if the *Department* discovers that an entity to which it disburses funds is engaging in a practice with a disparate racial impact, then the Department must cease funding to that entity. Defendants insist that the regulations themselves do not allow for a private right of action, and that plaintiffs' only means for asserting a claim under the regulations is by way of an action under 42 U.S.C. § 1983.[12]

The weakness of defendants' argument is illustrated by the supporting authority they cite: a footnote, joined by only one other Member of the Court (the Chief Justice), in Justice Powell's *Guardians* concurrence. 463 U.S. at 608 n. 1, 103 S.Ct. at 3235 n. 1 (Powell, J., concurring in the judgment) ("[I]t would seem that the regulations may be enforced only in a suit pursuant to 42 U.S.C. § 1983[.]"). Although five Justices determined that the regulations were valid and did allow for declaratory and injunctive relief, *see* pages 1545–46, *supra*, the Court did not expressly consider whether those regulations may be enforced by way of a private right of action, or whether a private litigant must pursue a claim under § 1983.

The Ninth Circuit applies a two-part test to determine whether agency regulations give rise to a private right of action: "(1) whether Congress delegated authority to establish rules implying a private right of action; and (2) whether the rule in question was drafted such that [a] private right of

action may legitimately be implied." *Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 534 (9th Cir.1984). Under the first prong, a court "merely need[s] to verify that Congress authorized the implementation of the statute with agency regulations." *Id.* at 536. In the case of Title VI, that authority appears on the face of the statute. 42 U.S.C. § 2000d-1 ("Each Federal department and agency which is empowered to extend Federal financial assistance to any program or activity ... is authorized and directed to effectuate the provisions of [Title VI] by issuing rules, regulations, or orders of general applicability....").

With respect to the second prong, which is the ultimate determination whether to imply a private right of action, a court must make a series of findings:

[I]f the rule in question is valid and [if it] furthers the substantive purposes of the enabling statute, and [if] the statute provides a private right of action as a matter of congressional intent, [the court] will imply the private right of action into the rule as well, regardless of agency intent.

*Robertson*, 749 F.2d at 536; *accord Polaroid Corp. v. Disney*, 862 F.2d 987, 994 (3d Cir. 1988). All three of these requirements are satisfied. As discussed in Section 2, *supra*, the Supreme Court has held that the regulations are valid and that they further the congressional purpose of withholding federal funds from discriminatory practices. *Guardians*, 463 U.S. at 591–93, 103 S.Ct. at 3226–27 (opinion of White, J.); *id.* at 617–23, 103 S.Ct. at 3240–43 (Marshall, J., dissenting); *id.* at 642–45, 103 S.Ct. at 3253–55 (Stevens, J., dissenting).

*Federal Practice and Procedure: Civil* § 1219, at 191 (2d ed. 1990). Plaintiffs' first amended complaint clearly meets this standard.

---

11. Quite beside the point is defendants' argument that plaintiffs, in their first amended complaint, failed to specify precisely which regulations defendants violated. Defendants expend only two sentences on this argument; that is a wise decision on their part to conserve resources (and pages in their brief). Under Rule 8(a) of the Federal Rules of Civil Procedure, the first amended complaint withstands such an attack so long as it appears "that plaintiff[s] may be entitled to any form of relief, even though the particular relief [they have] demanded and the theory on which [they seem] to rely are not appropriate." 5 Charles Alan Wright & Arthur R. Miller,

12. It must be noted that a § 1983 action has an undeniable procedural advantage for defendants: Congress has not abrogated the States' Eleventh Amendment immunity for a suit under § 1983. *Quern v. Jordan*, 440 U.S. 332, 339–45, 99 S.Ct. 1139, 1144–47, 59 L.Ed.2d 358 (1979). In contrast, Congress *has* abrogated the States' Eleventh Amendment immunity from suit under Title VI. 42 U.S.C. § 2000d-7.

Although the Supreme Court has not explicitly held that Title VI allows for a private right of action, the weight of authority suggests quite clearly that it does. In *Cannon,* the Court held that Title IX allows for private right of action. The Court reached this conclusion mainly because Congress drafted Title IX in terms almost identical to those of Title VI, and did so at a time when Congress understood private rights of action to be authorized under Title VI. 441 U.S. at 694–703, 99 S.Ct. at 1956–60. As Justice White has noted, "it was the unmistakable thrust of the *Cannon* Court's opinion that the congressional view was correct as to the availability of private actions to enforce Title VI." *Guardians,* 463 U.S. at 594, 103 S.Ct. at 3228 (opinion of White, J.).

Under the Ninth Circuit's *Robertson* analysis, plaintiffs may maintain a private right of action based on the administrative regulations promulgated pursuant to Title VI.

### 4.

Finally, defendants contend that some or all of plaintiffs' claims against the State (but *not* against the CTC) are barred by the applicable statute of limitations. Plaintiffs filed their original complaint on September 23, 1992. Defendants raised the statute of limitations as a defense in their answer. (Answer, filed Dec. 3, 1992, at 3:5–6.)

██ Title VI does not include a limitations period. The Ninth Circuit has determined that Title VI suits "are governed by the same state limitations period applicable to claims brought under [42 U.S.C.] § 1983." *Taylor v. Regents of the Univ. of Cal.,* 993 F.2d 710, 712 (9th Cir.1993) (*per curiam*). The Supreme Court has held that, for purposes of determining the applicable statute of limitations, § 1983 claims are best characterized as personal injury actions. *Wilson v. Garcia,* 471 U.S. 261, 276, 105 S.Ct. 1938, 1947, 85 L.Ed.2d 254 (1985). Hence, the applicable statute of limitations is that which covers personal injury actions in California. Cal.Civ.Proc.Code § 340(3) (one year statute of limitations for personal injury actions).

██ "Although state law defines the length of the limitations period, federal law determines when the plaintiff's alleged cause of action accrued." *Archer v. Airline Pilots Ass'n Int'l,* 609 F.2d 934, 937 (9th Cir.1979) (*per curiam*), *cert. denied,* 446 U.S. 953, 100 S.Ct. 2920, 64 L.Ed.2d 810 (1980). "Under federal law a cause of action accrues when the plaintiff is aware of the wrong and can successfully bring a cause of action." *Acri v. International Ass'n of Machinists & Aerospace Workers,* 781 F.2d 1393, 1396 (9th Cir.), *cert. denied,* 479 U.S. 816, 107 S.Ct. 73, 93 L.Ed.2d 29 (1986). With respect to discrimination claims, the Supreme Court has directed that "the proper focus is on the time of the *discriminatory act,* not the point at which the *consequences* of the act become painful." *Chardon v. Fernandez,* 454 U.S. 6, 8, 102 S.Ct. 28, 29, 70 L.Ed.2d 6 (1981) (*per curiam*).

While the principles that govern the statute of limitations issue are clear, they cannot be applied to this case on the record presently before the Court. Defendants' most extravagant argument is that the limitations period began to run on December 18, 1982, the date of the first CBEST administration. According to defendants, that is the last date on which the State took any action that could possibly have violated Title VI. This argument goes too far. Obviously, the individual plaintiffs had no standing to challenge any of the State's actions with respect to the CBEST until they took the test, failed it, and suffered the actual or threatened loss of their credentials. *See Lujan v. Defenders of Wildlife,* —— U.S. ——, ——, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992).

Defendants appear to concede that the statute did not begin to run for the individual plaintiffs on December 18, 1982, but they refuse to back down on that date with respect to at least one of the institutional plaintiffs, the Association of Mexican American Educators ("AMAE"). Defendants insist that the AMAE was aware of its discrimination claim in 1983, and claim that the organization filed a Title VII charge with the Equal Employment Opportunities Commission ("EEOC") in that year. While it is true that plaintiffs admit they filed a charge with EEOC, (First Am.Compl., filed Nov. 16, 1993, ¶ 12), the record is devoid of evidence

showing precisely *when* they filed that charge.

 The record is similarly deficient with respect to the relevant dates for *any* individual of the plaintiffs. According to defendants, at least four of the individual plaintiffs were notified they failed the CBEST before January 1991 (thus falling outside the one year limitations period). (*See* Defs.' Reply Br., filed June 15, 1993, at 5:20–6:4.) Defendants have submitted no evidence to support these assertions. Because defendants raised the statute of limitations as an affirmative defense, they have the burden of introducing evidence to support that defense on a motion for summary judgment. *United States v. Carter*, 906 F.2d 1375, 1378 (9th Cir.1990). Defendants have failed to meet that burden.

This is not to say that defendants are barred from pursuing the statute of limitations defense at a later stage in these proceedings. Defendants may renew this argument in the form of another motion for summary judgment, after they have completed additional discovery, or they may raise the issue with respect to certain plaintiffs at the time of the motion for class certification. On the record presently before the Court, however, defendants' statute of limitations argument is rejected.

### C.

 Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer ... to fail or refuse to hire ... any individual ... because of such individual's race [or] color...." 42 U.S.C. § 2000e–2(a)(1). Plaintiffs allege that defendants' use of the CBEST runs afoul of Title VII because the test has a disparate impact on racial minorities and is not justified by any educational necessity, and because alternative, less discriminatory measures exist by which the State may test the basic skills of its teaching applicants. It is well established that a disparate impact claim will lie under Title VII. *Griggs*, 401 U.S. at 431, 91 S.Ct. at 853; *see also* 42 U.S.C. § 2000e–2(k).

With respect to Title VII, the parties disagree on two major points. First, they dispute whether the CBEST is a licensing examination. If it is, then there is good authority for the proposition that Title VII does *not apply*; if, however, the CBEST is an employment examination, then Title VII does apply. Second, the parties disagree whether the State or the CTC may be liable under Title VII given that neither entity directly employs plaintiffs or the members of the class that plaintiffs purport to represent. The two issues are considered in turn.

### 1.

 It is well established that Title VII applies "to governmental and private employers alike." *Dothard v. Rawlinson*, 433 U.S. 321, 332 n. 14, 97 S.Ct. 2720, 2728 n. 14, 53 L.Ed.2d 786 (1977). It also is well established, however, that Title VII does not apply to governmental licensing activities. *Haddock v. Board of Dental Examiners*, 777 F.2d 462, 464 (9th Cir.1985) (California's Board of Dental Examiners not subject to liability under Title VII). Defendants argue vigorously that the CBEST is merely a licensing examination, analogous to the examinations required for entry into the medical, legal, nursing, or accounting professions.

 Although defendants devote a large portion of their brief to pursuing this point, their argument is flawed for one simple reason: passage of the CBEST is required *only* for those individuals who seek employment with *public* schools in California. *See* Cal. Educ.Code §§ 44225(b)(1), 44252(b), 44830. Any individual who wishes to teach in a *private* school in California need not pass the CBEST and need not be certified by the CTC to do so. Because of that simple distinction, defendants' suggested analogies to the various other professional exams (law, medicine, etc.) do not hold.

Quite beside the point is defendants' argument that the CBEST, like the bar examination or the medical boards, does not guarantee employment but merely certifies that a candidate possesses certain minimal qualifications to do the job. Although the tests are similar in that respect, that is where the analogy ends. An unsuccessful bar applicant may not hold himself or herself out as a lawyer; the unsuccessful CBEST candidate

is free to pursue employment with any private school in the State.

Defendants recognize this distinction, but nevertheless hold to their argument that the CBEST is merely a licensing examination. Defendants point out that, although someone who does not pass the bar may not engage in the practice of law, he or she may perform legal services; thus, an individual may be employed as a clerk in a law firm without being licensed to practice law. Similarly, defendants argue, failing the CBEST does not bar an individual from teaching all students in the State, it only prevents the individual from teaching public school students. This argument proves too much, for it is tantamount to proving that the CBEST is *not* a licensing examination. The State has made passage of the CBEST an absolute prerequisite for certificated employment in its *own* schools, not in the schools operated by other entities. The conclusion is unescapable that the CBEST is an examination that tests an individual's qualification for a job with a particular employer (the State), not an examination that tests minimal competence for the job of teaching.

Beyond these arguments, the only "reasoning" advanced in response to the public/private school distinction is contained in the following passage from defendants' brief:

Plaintiffs contend that the CBEST is distinguishable from the dental boards and the bar exam because a teaching certificate is not required to teach in private schools. This argument is flawed for two reasons. First, the State has made a policy decision to limit its licensing to public education. This policy decision does not invalidate its licensing activities. While it is undisputed that the State has the authority to regulate private schools under its police powers, the State has thus far chosen not to exercise such powers. To the extent that Plaintiffs disagree with this policy decision, their disagreement is more appropriately registered with their elected representatives, rather than this court.

Second, the State made the policy decision that regulating the private schools is unnecessary. By their own admission, Plaintiffs agree with this decision. The

State's decision to regulate only those individuals who seek to teach in the public schools is entirely consistent with the exercise of the State's police power to protect the public health, safety and other valid interests.

(Br. in Supp. of Defs.' Mot. for Partial Summ. J., filed May 3, 1993, at 13:12–27 (internal quotation marks and citations to plaintiffs' brief omitted).) It's difficult to conceive of a policy argument more naked than the one presented by defendants in these two paragraphs. Defendants not only fail to cite a single case in support of this argument, they fail completely to acknowledge that their "policy choices" are constrained by Title VII.

Plaintiffs' alleged admission, referred to in the second paragraph, that regulation of the private schools is "unnecessary" is a statement that appears *in a footnote* of plaintiffs' opening brief. There, plaintiffs observe that the State's private schools are "widely regarded as superior" to the public schools despite the fact that private school teachers need not pass the CBEST. (Pls.' Mem. of P. & A., filed Apr. 1, 1993, at 21 n. 30.) This is hardly the "admission" defendants claim it to be.

Defendants may be able to justify the CBEST as a valid employment examination under Title VII. Because the CBEST is a requirement only for those individuals who wish to teach in the State's public schools, however, defendants cannot avoid liability on the ground that the CBEST is a licensing examination.

### 2.

The parties agree that certificated educational personnel are "employees" for Title VII purposes. *See* 42 U.S.C. § 2000e(f). The parties also agree that plaintiffs and the class they purport to represent are *not* defendants' "employees." Plaintiffs are the potential employees of local school districts, which are responsible for hiring certificated personnel to fill the instructional needs of schools within those districts.

The parties do contest whether defendants, the entities responsible for the CBEST requirement, may nevertheless be liable under

Title VII because of the obstacle they place in plaintiffs' path to employment with those districts (i.e., the CBEST). Plaintiffs argue that this question may be answered in the affirmative for any one of three reasons: (1) because the State and the CTC interfere with plaintiffs' employment relationship with local school districts; (2) because the local school districts are "mere instrumentalities" of the State within the public school system; or (3) because the State and the local school districts are so intertwined as to constitute a single or "joint" employer for Title VII purposes. The first of these arguments carries the day for plaintiffs. Accordingly, the other two arguments are not considered.

■■ In support of their first argument, that the State and the CTC interfere with plaintiffs' and the districts' employment relationship, plaintiffs rely on *Sibley Memorial Hospital v. Wilson*, 488 F.2d 1338 (D.C.Cir. 1973). The plaintiff in *Sibley* was a private male nurse, licensed to practice in the District of Columbia, who received patient referrals through the nursing offices of the District's private hospitals. The defendant was one such hospital. The plaintiff sued the defendant hospital, alleging that on two occasions, supervisory nurses at the hospital refused to refer him to patients because he was a male and the patients were both females. The plaintiff was not employed by the hospital; his employers were the patients to whom he was referred. Nevertheless, the court held that the plaintiff *could* state a cause of action against the hospital:

> Control over access to the job market may reside, depending upon the circumstances of the case, in a labor organization, an employment agency, or an employer as defined in Title VII; and it would appear that Congress has determined to prohibit each of these from exerting any power it may have to foreclose, on invidious grounds, access by any individual to employment opportunities otherwise available to him. *To permit a covered employer to exploit circumstances peculiarly affording it the capability of discriminatorily interfering with an individual's employment opportunities with another employer, while it could not do so with respect to*

*employment in its own service, would be to condone continued use of the very criteria for employment that Congress has prohibited.*

*Id.* at 1341 (emphasis added). *Sibley* is good law in the Ninth Circuit. *Gomez v. Alexian Bros. Hosp.*, 698 F.2d 1019, 1021 (9th Cir. 1983) (*per curiam* ).

There is no question but that under *Sibley*, defendants cannot escape Title VII liability solely because they are not plaintiffs' employers. While defendants are correct that passage of the CBEST does not guarantee a job (a successful applicant must be hired by the local school district), passing the test is the *sine qua non* of employment in California's public schools.

Defendants cite a number of cases that distinguish *Sibley*, but those cases render defendants no aid because *all* of them concerned *licensing* examinations. *See, e.g., Darks v. City of Cincinnati*, 745 F.2d 1040, 1042 & n. 3 (6th Cir.1984) (licensing for dance halls); *NOW v. Waterfront Comm'n*, 468 F.Supp. 317, 320 (S.D.N.Y.1979) (licensing for stevedores and peer watchmen); *Lavender–Cabellero v. Department of Consumer Affairs*, 458 F.Supp. 213, 215 (S.D.N.Y.1978). For the reasons discussed above, defendants' argument that the CBEST is merely a licensing examination is wholly without merit. Their attempt to distinguish *Sibley* on that same ground must likewise be rejected.

### III.

Accordingly,

IT IS HEREBY ORDERED that:

1. Plaintiffs' motion for partial summary judgment on the applicability of Title VI is GRANTED, and defendants' motion for partial summary judgment on the applicability of Title VI is DENIED.

2. Plaintiffs' motion for summary judgment on the applicability of Title VII is GRANTED, and defendants' motion for summary judgment on the applicability of Title VII is DENIED.